STATE OF CONNECTICUT *v.* JAMES P. APOSTLE
(2766)

DUPONT, C. J., SPALLONE and BIELUCH, Js.

Argued December 3, 1985—decision released July 22, 1986

*Hubert J. Santos,* for the appellant (defendant).

*John H. Malone,* assistant state's attorney, with whom, on the brief, was *John M. Bailey,* state's attorney, for the appellee (state).

DUPONT, C. J. After a trial to a jury, the defendant was convicted of sexual assault in the first degree, a violation of General Statutes § 53a-70, and risk of injury to a minor, a violation of General Statutes § 53-21.[1] On

---

[1] The defendant was found not guilty of kidnapping in the first degree.

appeal, the defendant claims that the court erred: (1) in allowing the state to cross-examine the defendant about his failure subsequently to correct a false statement given by him to the police and to comment on that failure during the state's final argument; (2) in permitting the state to cross-examine defense witnesses about the defendant's general character traits; (3) in permitting a hospital emergency room physician to give an opinion that the victim did not consent to intercourse with the defendant; (4) in failing to disclose to the defendant the contents or substance of portions of the department of children and youth services (DCYS) file about the victim; (5) in allowing the state to argue in summation that the defendant should have called the victim's social worker as a witness; (6) in prohibiting the defendant from introducing testimony concerning the victim's prior sexual experiences; (7) in permitting the state to elicit, on redirect examination of the victim, portions of a statement which she gave to the police; and (8) in denying the defendant's request to charge on the issue of consent in connection with the court's charge on the crime of risk of injury to a minor.

The jury reasonably could have found certain relevant facts based upon the evidence presented. The victim was fifteen years and nine months old on the date of the alleged assault and had been living with foster parents for seven months under DCYS supervision. She had an argument with her foster parents and left home accompanied by a girlfriend. Sometime later, after her friend had returned home, she spoke with the defendant, who had stopped his car at a stoplight. The defendant asked her if she needed a ride and she asked for a ride home. After entering the car, she became afraid of the defendant. He drove to a park where she exited from the car in order to get away from him. He then picked her up, carried her to a wooded area and pushed her down on the ground against a tree. He lifted her

shirt, pulled down her shorts, tore off her underwear, and had forced sexual intercourse with her. The victim told the defendant her age prior to the intercourse. The defendant later struck her, urinated on her legs, and then left her. She crawled to a nearby brook where she washed her legs and put on her clothes. She walked to a nearby street and, subsequently, a couple stopped their car and picked her up. They testified that she was crying and hysterical. The victim later called a friend who picked her up and took her to his house, where she told his mother and sister what had happened. Thereafter, she was taken to a hospital where she was examined and treated.

The defendant testified that, although he had sexual intercourse with the victim, it was consensual and followed some kissing in his parked car. He further testified that she told him she was almost seventeen years old, that he did not strike her or urinate on her, and that she became hysterical after the consensual intercourse.

## I

The defendant claims that he was denied a fair trial, due process of law and the right to counsel, in violation of the fifth, sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution because the court allowed the state to cross-examine him about his failure to contact the police after their interrogation of him had ceased in order to correct a statement he had given to the police and to comment about that failure during the state's final argument.[2] The defendant character-

---

[2] The defendant relies on the United States constitution and the Connecticut constitution but does not analyze them separately, stating only that article first, § 8, of the Connecticut constitution gives the defendant greater rights than the federal constitution. Without that analysis, there is no basis for us to discuss the Connecticut constitution. See *State* v. *Cosby*, 6 Conn. App. 164, 166 n.1, 504 A.2d 1071 (1986).

izes this issue as one involving post-arrest silence and the state characterizes it as one involving the permissible use of prior inconsistent statements to impeach credibility during cross-examination.

After his arrest, the defendant was given the warnings required by *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). He then gave a written statement to the police which was admitted into evidence as an exhibit. On direct examination, he admitted that material portions of the statement were false, but that the falsities were induced by fear and were made prior to his consultation with a lawyer.[3] On cross-examination, he was asked why he had not returned to the police station to correct the statement. The defendant's answer was "If I thought I could, I would have after I talked to my attorney." Defense counsel objected to the question but took no exception, and raised no constitutional claim as the basis for the objection. On redirect examination, the defendant testified that his attorney advised him "not to discuss anything with any police officer from that point on." During final argument, the prosecutor referred to this testimony and claimed that the defendant could and should have corrected his statement.[4]

---

[3] The defendant, in his written statement to the police, said that the victim was hitchhiking, he gave her a ride, then left her in the center of town, and that no sexual intercourse had occurred.

[4] The prosecutor's questioned remarks during final argument to the jury are as follows: "The false statement. A person who gave a statement under oath when he didn't have to, you'll see in the Exhibits he was advised he could remain silent. He didn't have to say anything, if anything he did say, if he did say anything, it would be used against him. He could have kept silent. He could have said nothing, but he didn't. He lied as he testified. He gave a false statement under oath, and we went through the statement. There are at least five or six different total falses in there. Why did he give the false statement? He says because he thought the law was such and such. So what did he do? Lied to get around that law, lied to escape the consequences of his behavior. Now that he's out and finds out from his lawyer that the law is otherwise, he comes in and gives another story. Can you

The defendant claims that the issue is reviewable, even though not raised at trial, because it involves fundamental constitutional rights to remain silent, to due process, to the assistance of counsel and to a fair trial. See *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). We agree with the defendant because the record here supports his claim that a fundamental constitutional right of his is involved, the right to remain silent after *Miranda* warnings had been given. *State* v. *Morrill,* 197 Conn. 507, 535–37, 498 A.2d 76 (1985); *State* v. *Pellegrino,* 194 Conn. 279, 286–89, 480 A.2d 537 (1984).

As far as this court is aware, the precise issue of this case has not been the subject of the holding of any other reported case, either federal or state. The issue is whether, after the warnings of *Miranda* are given and the defendant chooses to answer questions posed by the police, the defendant has an affirmative obligation when his interrogation has ceased, to return to the police to correct a false statement made during that interrogation about the facts or circumstances of the crime. We conclude that he does not, and that the state may not question him or comment about that failure. Our conclusion is based upon the subsidiary conclusion that a defendant has a constitutional right after he has been given *Miranda* warnings to abstain from further

believe it? Can you believe the sworn testimony up here of a person who gave a sworn written statement which it later turned out to be false? . . . *He never corrected the false statement.* He claims now that his lawyer told him not to. Well, it may be; but he gave a false statement to the police. *He could have come up and said I was nervous, here's what really happened.* We had intercourse. She consented to it. Here, put this in your record. *So when I testify I can testify that I corrected that statement and the real reason I did it was because I was nervous at the time. But now that I'm out of custody I've talked to my lawyer, I want to tell the truth. Did he say that? No, not once.''* (Emphasis added.)

The defendant did not object to the argument, did not request a curative or cautionary instruction, and did not except to the court's charge which contained no such instruction.

comment to governmental authorities when his physical custodial inquiry by them has ceased.

It is as important, in this case, to delineate what the issue is *not* as it is to state what the issue *is*. We are not concerned with the state's right to impeach the credibility of the defendant on cross-examination by inquiring into the content of any statements voluntarily and knowingly made by him after he has received the warnings mandated by *Miranda*. Nor is this case related to those which have explored the parameters of a defendant's decision to remain selectively silent during his interrogation after *Miranda* warnings have been given. See *State* v. *Talton,* 197 Conn. 280, 497 A.2d 35 (1985). In this case, the state did, and had a right to, cross-examine the defendant exhaustively as to all of his admittedly false statements relating to the crime with which he was charged made to the police after his *Miranda* warnings. There is no doubt that the use of a statement made after *Miranda* warnings have been given, relating to the facts of the crime with which the defendant is charged, may be used to impeach his credibility by illustrating inconsistencies between that statement and a different exculpatory statement given during his in-court testimony. *State* v. *Reid,* 193 Conn. 646, 480 A.2d 463 (1984).

A review of but a few cases is necessary to provide the decisional background sufficient for the decision in this case. The "use for impeachment purposes" of a defendant's silence, "at the time of arrest and after receiving *Miranda* warnings," violates "the Due Process Clause of the Fourteenth Amendment." (Footnote omitted.) *Doyle* v. *Ohio,* 426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). It should be noted that *Doyle,* its predecessor, *United States* v. *Hale,* 422 U.S. 171, 95 S. Ct. 2133, 45 L. Ed. 2d 99 (1975), and *Miranda* itself all discuss the right of a defendant to remain silent *at the time of the arrest* and the failure

of the defendant to speak about facts relating to the case *at that time.* See *Miranda* v. *Arizona,* supra, 474; see also *Doyle* v. *Ohio,* supra, 616; *United States* v. *Hale,* supra. These cases concern in-custody interrogation and their focus is on the period immediately following the defendant's receipt of *Miranda* warnings.

When the defendant chooses to make no statement at all after being given his *Miranda* warnings, his silence cannot be commented upon during his trial, nor may that silence be used to impeach an explanation subsequently offered by him during his trial. The rationale for this proposition, as stated in *Doyle,* is that such silence is "insolubly ambiguous" and the use of such silence would penalize the defendant for relying upon the governmental assurances contained in *Miranda* warnings. If, however, a defendant, after receiving *Miranda* warnings, opts to waive his right to remain silent, and gives the police a statement, that statement may be used to impeach the credibility of the defendant when he testifies at trial to a different exculpatory version.[5] *Anderson* v. *Charles,* 447 U.S. 404, 100 S. Ct. 2180, 65 L. Ed. 2d 222, reh. denied, 448 U.S. 912, 101 S. Ct. 27, 65 L. Ed. 2d 1173 (1980).

It is constitutionally permissible under *Anderson* to delve into a defendant's prior inconsistent statement and to inquire about the reasons for the inconsistency. Id., 408. The *Anderson* court is referring to those statements made during custodial interrogation since it speaks of the failure to tell "arresting officers." The principles of *Doyle* do not apply to a "formalistic silence," a silence which is a silence by omission of facts.

[5] It is now clear that the principles of *Doyle* v. *Ohio,* 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), do not apply unless *Miranda* warnings have been given. See *Fletcher* v. *Weir,* 455 U.S. 603, 102 S. Ct. 1309, 71 L. Ed. 2d 490 (1982). The fact that the defendant has or has not been arrested at the time of a statement given after *Miranda* warnings is, therefore, irrelevant.

Id., 409. Thus, it was proper in this case for the state to question the defendant about his "formalistic silence," that custodial silence which omitted his claim made at trial that he had consensual intercourse with the victim. The principles of *Doyle* are not applicable to anything the defendant told the police about the facts of the crime and the state could properly question the defendant and comment about them.

Connecticut cases which have discussed "post-arrest silence" refer to "silen[ce] in the face of police interrogation," silence at "the time of arrest," or "custodial silence"; *State* v. *Zeko,* 177 Conn. 545, 551, 556, 418 A.2d 917 (1979); or concern facts indicating that the statement was made during physical custodial interrogation. *State* v. *Talton,* supra; *State* v. *Reid,* supra. Thus, a waiver of the right to "post-arrest silence" relates to statements made by a defendant about the crime in response to governmental inquiry. Without such inquiry, we conclude that the defendant cannot waive his right to silence, after he has been given *Miranda* warnings.

A defendant may reassert his right to remain silent at any time, and if he ceases to answer questions, or to come forward with additional or correcting information after questions are no longer being asked of him, there is a reasonable possibility that he is relying upon that right. See note, "Protecting *Doyle* rights after *Anderson* v. *Charles:* The Problem of Partial Silence," 69 Va. L. Rev. 155, 166 (1983). *Miranda* warnings and the "Advisement of Rights" form signed by the defendant in this case both state that if the defendant answers any questions, he has the right to stop answering them at any time. Both advise that anything the defendant says can and will be used against him in court. The logical corollary of the latter statement is that when he says nothing at all and he is no longer in the physical custody of the government, the

lack of a statement *cannot* be used against him. See id., 169. The reason for the defendant's failure to correct his statement after he was no longer being questioned by the police is unknown because it is impossible to know whether that subsequent silence arose because he relied on his *Miranda* rights, because he was guilty, because he was a liar, or because he was instructed by his lawyer not to speak to the police.

The facts here make the defendant's silence, after his interrogation had ceased, as "insolubly ambiguous" as the silence described in *Doyle*. In addition, questions at trial regarding this silence did not relate to the inconsistent versions of the substantive facts of the crime, but, rather to the act of the defendant in not returning to the police to correct the substantive facts he had previously given.

Two recent Connecticut cases support our conclusion. In *State* v. *Morrill,* supra, the defendant told the police that he was holding back information concerning a murder in order to make a "deal" with the state, and refused to answer questions specifically implicating him in the crime. The court held that the circumstances of the questioning did not naturally call for a reply from him, and his reason to fail to answer the questions was ambiguous since he may have failed to answer because he was guilty or because he did not want to speak until his "deal" was made. Id., 538. The testimony relating to this failure was an impermissible comment upon his right to remain silent. In the present case, since the defendant was not in custody, there were no circumstances which would naturally call for a reply, and his right to remain silent during that period is inviolate, even though a statement was previously made to the police when he was in custody. Post-*Miranda* constitutional silence does not exist in a vacuum. It attaches or relates to governmental questions. Without the questions, there need be no answers.

The case of *State* v. *Leecan,* 198 Conn. 517, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986), provides convincing dicta in support of our disagreement with the trial court. In that case, no prior statement by the defendant was given to the police during custody and the record was silent as to whether *Miranda* warnings were given. During his trial testimony, the defendant, in answer to a question about whether he had gone to the police to tell them that he wasn't involved in the crime, answered that he had not " 'until I turned myself in . . . .' " Id., 532. This answer implies that he told the police then the *same* story which he told at trial. If that were true, the earlier story and the trial testimony would have been compatible and *Doyle* would not apply, even if *Miranda* warnings had been given. Id. The *Leecan* court went on to discuss, as further dicta, whether the state could, within the confines of *Doyle* and after *Miranda* warnings had been given, question the defendant to determine if his in-court testimony was the first time he had done anything "to clear this case up" and if he had ever done anything up to the day of his testimony to do the same. The court concluded that such questions about his "post-arrest" silence would have been error under those circumstances. The court, therefore, sub silentio, makes a comment about the constitutional silence of *Miranda* and *Doyle,* by recognizing two different time periods to which the right of silence might attach. One is the period during which a defendant is being interrogated and the other is the period when interrogation has ceased but the trial has not yet begun. In the latter period of silence, the *Leecan* court recognized that the prohibitions of *Doyle* against the use of such silence against the defendant apply.

Questioning the defendant about his failure to correct his original false statement, in combination with the state's comments about that failure, suggested to the jury that his silence during his freedom from cus-

todial interrogation could be interpreted as implying guilt or as a comment on his federal fifth amendment right to remain silent. It was impermissible for the reasons previously stated.

The next question on appeal is whether it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the impermissible questioning and impermissible comment. See *State* v. *Morrill,* supra, 539. Under certain circumstances, the state's use of a defendant's post-arrest silence does not constitute reversible error. In limited instances, " '[w]hen there is but a single reference at trial to the fact of defendant's silence, the reference is neither repeated nor linked with defendant's exculpatory story, and the exculpatory story is transparently frivolous and evidence of guilt is otherwise overwhelming, the reference to defendant's silence constitutes harmless error.' *Chapman* v. *United States,* 547 F.2d 1240, 1250 (5th Cir.), cert. denied, 431 U.S. 908, 97 S. Ct. 1705, 52 L. Ed. 2d 393 (1977); *Leake* v. *Cox,* 432 F.2d 982, 984 (4th Cir. 1970). The rule has similarly been applied where a prosecutor does not focus upon or highlight the defendant's silence in his cross-examination and closing remarks and where the prosecutor's comments do not strike at the 'jugular' of the defendant's story. *United States* v. *Davis,* [546 F.2d 583, 594 (5th Cir.), cert. denied, 431 U.S. 906, 97 S. Ct. 1701, 52 L. Ed. 2d 391 (1977)]; see *United States* v. *Harp,* 536 F.2d 601, 603 (5th Cir. 1976)." *State* v. *Zeko,* supra, 555; see *State* v. *Pellegrino,* supra, 291–92. Thus, a finding of harmless error in such circumstances is the exception to the rule, occurring in only a few instances. See *State* v. *Morrill,* supra, 539; *State* v. *Pellegrino,* supra, 293; *State* v. *Zeko,* supra, 558.

In this case, the prosecutor's questions highlighted the defendant's failure to correct his false statement prior to trial and the prosecutor made several refer-

ences to that failure in his closing argument to the jury. The questioning and the comments allowed the jury to draw an unfavorable inference from the defendant's silence. The exculpatory testimony, that the sexual intercourse was consensual, was not transparently frivolous, and the prosecutor's references to the failure to correct the statement were linked to the exculpatory testimony. The prosecutor told the jury, in essence, that the defendant did not have a right to remain silent after his original statement, but had an obligation to tell the police prior to trial that the original statement was false. These comments were not related to the credibility of the defendant. The evidence of guilt was not so otherwise overwhelming that the reference to the defendant's silence constituted harmless error. We conclude that such references by the prosecutor sufficiently highlighted the defendant's right to silence; see *State* v. *Pellegrino,* supra, 292; so that their admission constituted reversible error. *State* v. *Morrill,* supra, 539. The defendant's conviction must, therefore, be set aside, and a new trial ordered. Although a new trial must be ordered, the remaining claims of error are considered since they are likely to recur on retrial.

## II

The defendant's second claim of error is that the trial court erred in permitting the prosecutor to cross-examine witnesses about his character traits other than nonviolence when they had testified on direct examination solely to the defendant's character trait of nonviolence. The defendant produced several character witnesses, including some relatives and two long-time family friends, to testify to his nonviolent character. The direct testimony of these witnesses was limited to the specific trait of nonviolence.

On cross-examination of the two family friends, the prosecutor asked each of them at least three times

whether they were present to testify to the defendant's general good character and his reputation as a law abiding citizen in the community or whether they were called by the defendant to testify only as to his character trait of nonviolence. Counsel for the defendant objected to these questions. The state claimed that the questions were asked merely to clarify the limits of the testimony of the witnesses and that the questions were not about character traits other than the trait of nonviolence. The trial court overruled the objections and allowed the questions. The witnesses responded that they were not present to testify to the defendant's general good character or his reputation as a law abiding citizen.

The issue to be decided is whether the questions, although asked under the guise of determining the parameters of the direct testimony, were actually questions about the defendant's good character, and, therefore, beyond the scope of direct examination which was limited to the character trait of nonviolence.

The defendant had the right to offer evidence about his character traits which were relevant to the crime with which he was charged. *State* v. *Turcio,* 178 Conn. 116, 127, 422 A.2d 749 (1979), cert. denied, 444 U.S. 1013, 100 S. Ct. 661, 62 L. Ed. 2d 642 (1980); McCormick, Evidence (2d Ed. 1972) § 191, p. 454.

"If the accused offers evidence of a trait of character as circumstantial evidence to prove that he acted in conformance with that trait and that it is unlikely he committed the crime charged, then the prosecution may offer evidence to disprove the existence of the trait." *State* v. *Martin,* 170 Conn. 161, 163, 365 A.2d 104 (1976). The plain meaning of this rule is that questions on cross-examination must be limited to the specific character trait or traits placed in evidence by the defendant, since it is those traits which the prosecu-

tion may disprove. See also *United States* v. *Curtis,* 644 F.2d 263, 268 (3d Cir. 1981), cert. denied, 459 U.S. 1018, 103 S. Ct. 379, 74 L. Ed. 2d 512 (1982); *United States* v. *Lewis,* 482 F.2d 632, 639 (D.C. Cir. 1973); 1A Wigmore, Evidence (Tillers Rev.) § 59, p. 1249 n.4.

The questions here were of the genre of "when did you stop beating your wife." They inquired about a negative in order to imply a positive and, when coupled with the prosecution's references to them in closing argument, allowed the jury to consider character traits not introduced into evidence by the defendant. " 'This method of inquiry or cross-examination is frequently resorted to by counsel for the very purpose of injuring by indirection a character which they are forbidden directly to attack in that way; they rely upon the mere putting of the question (not caring that it is answered negatively) to convey their covert insinuation. The value of the inquiry for testing purposes is often so small and the opportunities of its abuse by underhand ways are so great that the practice may amount to little more than a mere subterfuge . . . .'" *Michelson* v. *United States,* 335 U.S. 469, 473–74 n.4, 69 S. Ct. 213, 93 L. Ed. 168 (1948), quoting 3 Wigmore, Evidence (3d Ed. 1940) § 988.

Although the extent of cross-examination is within the discretion of the trial court and every reasonable presumption should be made in favor of the correctness of the court's ruling; *State* v. *McCarthy,* 197 Conn. 247, 261, 496 A.2d 513 (1985); the trial court in this case abused its discretion. See *State* v. *Zdanis,* 173 Conn. 189, 196, 377 A.2d 275 (1977); *State* v. *Martin,* supra, 167. Since there is to be a retrial of this case, it is not necessary to consider whether the ruling here involved was harmful. See *State* v. *Cohane,* 193 Conn. 474, 480, 479 A.2d 763, cert. denied, 469 U. S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984); *Mack* v. *Perzanowski,* 172 Conn. 310, 315, 374 A.2d 236 (1977).

## III

The defendant's third claim of error is that the trial court erred in allowing the emergency room physician, who examined the victim shortly after the incident, to testify on redirect examination that, in his opinion, the intercourse between the defendant and the victim was nonconsensual. On cross-examination, defense counsel asked the witness if his examination of only the vaginal area of the victim would have indicated whether the intercourse was consensual or nonconsensual. The doctor responded that he could only state that the intercourse was traumatic. On redirect examination, the doctor was asked whether, in his opinion, taking into consideration his physical examination of the victim, her mental state at the time of the examination and the history of the incident which she gave to him, the intercourse was consensual or nonconsensual. After objection and exception by defense counsel, the doctor testified that, in his opinion, the intercourse was nonconsensual. This testimony was subsequently emphasized by the state during its closing argument to the jury.[6]

The defendant objects to the trial court's ruling on the ground that the issue of whether the intercourse between the victim and the defendant was consensual was the ultimate issue in the case, which was for the

---

[6] The relevant portion of the state's argument is as follows: "What does the doctor testify? He examined her and found evidence of trauma, and he was asked by Attorney Slitt couldn't this have been just a difficult but voluntary consensual intercourse. He said no. Based on the undisputed medical findings, based on his examination, it was his opinion and his conclusion that it was forceable rape, not consensual whatsoever. . . . We have here the results of the examination of the genital-urinary. You can read that. Doctor testified—he was asked to testify . . . whether it was consensual and in his opinion based on the facts that he saw, the history that he saw, the state of the girl's mind at the time, it was forceable, not consensual."

jury to decide, and was not an appropriate subject for expert testimony. As a general rule, the test for the admissibility of expert testimony is whether the witness offered as an expert has any peculiar knowledge or experience which renders the opinion founded on such knowledge or experience an aid to the court or the jury in determining the question in issue. See *State v. Palmer,* 196 Conn. 157, 166, 491 A.2d 1075 (1985); *Schomer* v. *Shilepsky,* 169 Conn. 186, 191, 363 A.2d 128 (1975).

It is well recognized, however, that testimony on matters which are not beyond the ken of the average juror does not qualify as admissible expert testimony. *State v. George,* 194 Conn. 361, 373, 481 A.2d 1068 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 963, 83 L. Ed. 2d 968 (1985). When inferences or conclusions are so obvious that they could be as easily drawn by the jury as the expert from the evidence, expert testimony regarding such inferences are inadmissible. Id.

The testimony of the doctor regarding whether the intercourse was consensual went beyond the scope of permissible expert testimony because it involved an opinion based upon factors outside the realm of his professional expertise. The doctor's opinion that the intercourse was nonconsensual was based in part upon the victim's emotional state as well as the victim's own representations given to him regarding the history of the incident. The doctor, therefore, reached a conclusion on the ultimate issue by drawing on factors already made known to the jury, and which went beyond his physical examination of the victim. Because such factors were previously presented before the jury, the jury was equally capable of reaching the conclusion sought from the doctor. Determination of this issue requires no special knowledge or experience. The doctor's conclusion, therefore, was inadmissible.

A review of the decisions of other jurisdictions which have considered this issue supports our conclusion. The general rule of law in such cases is that when a physician bases a conclusion in part upon statements made to him by the victim, he is in fact making a determination about the credibility of the witness. See, e.g., *State v. Castore,* 435 A.2d 321, 325–26 (R.I. 1981). Such credibility determinations are within the sole province of the jury. See also *Farley* v. *State,* 324 So. 2d 662, 663–64 (Fla. App. 1975); *State* v. *Bressman,* 236 Kan. 296, 303, 689 P.2d 901 (1984); *People* v. *McGillen,* 392 Mich. 278, 288, 220 N.W.2d 689 (1974); *People* v. *Byrd,* 133 Mich. App. 767, 779–80, 350 N.W.2d 802 (1984).

In *Commonwealth* v. *Gardner,* 350 Mass. 664, 216 N.E.2d 558 (1966), a physician, who had examined the victim after the alleged rape had occurred, was similarly asked at trial whether in his opinion, based upon his knowledge of the victim's emotional state and the history of the incident given to him by the victim, there was forcible entry. The doctor testified that in his opinion there had been forcible entry. The court held such testimony to be inadmissible, and stated that it was "not persuaded that a gynecologist, or other expert, possesses skills or special experience which might enable him to determine, from factors such as these, that acts of intercourse amounted to rape." Id., 667.

The trial court's ruling, when combined with the state's use of the doctor's testimony in its closing argument to the jury, sufficiently prejudiced the defendant so as to constitute an abuse of discretion by the trial court.[7] Such abuse of discretion constitutes reversible error. *Commonwealth* v. *Gardner,* supra.

---

[7] The state's argument that the defendant opened the door on cross-examination to the doctor's testimony is unpersuasive. On cross-examination, defense counsel limited his inquiry to whether, solely on the basis of his examination of the victim's vaginal area, the doctor could determine whether the intercourse was consensual or nonconsensual. On redirect

## IV

The defendant's fourth claim of error is that the trial court erred by failing to disclose to the defendant the contents or substance of the victim's DCYS file. The defendant claims that denial of access to these records violated his sixth amendment right of confrontation. See *Davis* v. *Alaska,* 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). He argues that because much of the state's case rested on the testimony of the victim and because his defense involved a challenge to the credibility of that witness, he is entitled to access to the information contained in the victim's records for possible use in cross-examination. The defendant also claims that the trial court's failure to disclose portions of the DCYS file denied him his right to a fair trial and his due process rights to exculpatory material; see *United States* v. *Agurs,* 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976); *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); and to acquire and present evidence critical to his defense.[8] See *Chambers* v. *Mississippi,* 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973).

In this case, the victim was living with foster parents, under DCYS supervision, at the time of the inci-

---

examination, the state exceeded the scope of the cross-examination by asking the witness for an opinion on the issue of consent based upon his physical examination *and* his evaluation of the victim's mental state *and* the history of the incident as relayed by her to him.

[8] The defendant also claims, citing *Chambers* v. *Mississippi,* 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973), and *Powell* v. *Alabama,* 287 U.S. 45, 53 S. Ct. 55, 77 L. Ed. 158 (1932), that lack of access to these records denied him his due process right to acquire and present evidence critical to his defense. The defendant fails to elaborate on this claim in his brief. We decline to review this claim because "[a]ssignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court." *Rodriguez* v. *Mallory Battery Co.,* 188 Conn. 145, 149, 448 A.2d 829 (1982); see also *State* v. *Frazier,* 7 Conn. App. 27, 40, 507 A.2d 509 (1986).

dent. After defense counsel subpoenaed the DCYS file, the trial court conducted an in camera inspection of the file to determine whether it contained exculpatory material and whether its contents should be disclosed to the defendant. The trial court informed defense counsel that in addition to the placement history of the victim, the file contained opinions, offered by nonprofessionals, that the victim exhibited a pattern of untruthful behavior in the past. When defense counsel asked that these portions of the file be turned over to him, the trial court denied his request. On appeal, the defendant argues that those portions of the file relating to the issue of the victim's untruthfulness, including the names and addresses of those lay persons who offered the opinions, should be disclosed to the defendant. The defendant claims that such evidence would have supported his claims that his intercourse with her was consensual, and that only after the intercourse did the victim become hysterical.

The issue of whether a trial court or a criminal defendant should be permitted to inspect confidential records of a state's witness to discover whether the records contain relevant impeaching evidence has recently received much scrutiny in our courts. See, e.g., *In re Robert H.,* 199 Conn. 693, 509 A.2d 475 (1986); *State v. Bruno,* 197 Conn. 326, 497 A.2d 758 (1985), aff'g 1 Conn. App. 384, 473 A.2d 311 (1984); *State v. Esposito,* 192 Conn. 166, 471 A.2d 949 (1984); *State v. Storlazzi,* 191 Conn. 453, 464 A.2d 829 (1983).[9]

---

[9] Three of these cases were decided after the trial in this case, and the fourth, *State v. Storlazzi,* 191 Conn. 453, 464 A.2d 829 (1983), had just been published. A trial court is expected to take cognizance of published decisions but is not expected to be prescient. The court here followed *State v. Storlazzi,* supra, which was not cited in the succeeding three cases. The *Storlazzi* holding has been seriously undermined by the trilogy of cases decided after it.

All of those cases involved a statutory prohibition against revelation of the contents of files maintined by certain agencies. *In re Robert H.,* supra, involved the records of a rape crisis center, the confidentiality of which are protected by General Statutes § 52-146k, and the other cases concerned psychiatric records of a patient-witness which may not be disclosed pursuant to General Statutes § 52-146e. *Storlazzi* also involved records of DCYS relating to psychiatric and psychological evaluation and treatment. This case concerns the statutory confidentiality provided by General Statutes § 17-47a for records or information received by DCYS.[10]

The rule to be followed in cases involving General Statutes §§ 52-146k and 52-146e is clear. "First, the defendant is required to make 'a showing that there is reasonable ground to believe that the failure to produce the information is likely to impair the defendant's right of confrontation such that the witness' direct testimony should be stricken. Upon such a showing, the court may then afford the state an opportunity to secure the consent of the witness for the court to conduct an in camera inspection of the claimed information and, if necessary, to turn over to the defendant any relevant material for the purposes of cross-examination. If the defendant does make such showing and such consent is not forthcoming then the court may be obliged to

---

[10] General Statutes § 17-47a provides: "Records kept or information received by the department of children and youth services and licensed child-care facilities and child-placing agencies regarding individuals in their care or custody shall not be open to inspection or their contents disclosed except for purposes directly connected with the provision of human resources *or upon order of a court* or under the provisions of part II of chapter 778. This section shall not affect the confidential exchange of information between social welfare, educational or law enforcement agencies regarding individuals in the care or custody of one of these agencies." (Emphasis added.) Part II of chapter 778 relates to the availability and confidentiality of records in adoption matters.

strike the testimony of the witness. If the consent is limited to an in camera inspection and such inspection, in the opinion of the trial judge, does not disclose relevant material then the resealed record is to be made available for inspection on appellate review. If the in camera inspection does reveal relevant material then the witness should be given an opportunity to decide whether to consent to release of such material to the defendant or to face having her testimony stricken in the event of refusal.' " *State* v. *Bruno,* supra, 329–30, quoting *State* v. *Esposito,* supra, 179–80.

The rule to be followed in cases involving General Statutes § 17-47a is less clear. The Connecticut Supreme Court has not yet had occasion to determine the question.

General Statutes §§ 52-146k and 52-146e provide that no disclosure of confidential communications made by a victim or a patient may be obtained without a waiver by the communicator. General Statutes § 17-47a, however, states that the records or information received by DCYS shall not be disclosed except in certain instances, including "upon order of a court." The decision to breach the confidentiality of the records, therefore, under the latter statute, does not lie solely with the child in the care or custody of DCYS, the child's guardian, or DCYS. Under certain circumstances, that decision may lie with a court, without the need to follow the *Esposito* rule.

Information given by a psychiatric patient or a victim of a sexual assault is generally given in the belief that both may "obtain care [or counseling] without fear of unwarranted embarrassment, and without apprehension of a future detrimental disclosure in court, either of which might deter the patient [or victim] from revealing his true symptoms." *State* v. *Bruno,* 1 Conn. App. 384, 393, 473 A.2d 311 (1984), aff'd, 197 Conn. 326,

497 A.2d 758 (1985). Records kept by DCYS are instead used to evaluate the best interests of the children in the care and custody of it. Such files often contain sensitive and private information about children and their parents, unrelated to the ability of a particular child to recall and relate the truth. We conclude that the principle of *State* v. *Januszewski,* 182 Conn. 142, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981), deemed to be inapposite to the circumstances of *State* v. *Esposito,* supra, applies here.

The statute involved in the *Januszewski* case, General Statutes § 1-19, does not preclude the disclosure of information contained in a personnel file for use in a criminal judicial proceeding if the court, after an in camera inspection, determines that a legitimate and demonstrated need for it is apparent. See *State* v. *Esposito,* supra, 178. The defendant in *Januszewski,* as in this case, claimed that the material was needed for impeachment purposes and involved his constitutional right to cross-examine the state's chief witness.

General Statutes § 17-47a does not bar, without exception, the release of the records and information garnered by DCYS unless the child, the child's guardian or DCYS allow that release, but leaves the question of disclosure, in cases such as this, to the discretion of the court. That discretion cannot be exercised unless the court examines the file to determine whether the defendant's need to obtain confidential matter in order to discover impeaching material necessary to exercise his right of confrontation outweighs the public policy of confidentiality expressed in the statute.

Additional factors include the nature of the confrontation which is allegedly affected; see *State* v. *Cosby,* 6 Conn. App. 164, 167–72, 504 A.2d 1071 (1986) (cross-examination for bias, interest or motive distinguished

from cross-examination as to general credibility); the nature of the material examined, the remoteness of that material, and the availability of other means of testing the victim's reliability.

In this case, the court examined the file and found *lay* opinions that the victim had been untruthful in the past. Our examination of the file shows no more. The file does not contain any statements relevant to the alleged crime provided by the victim but statements made by others as to her veracity.

The untruthfulness of the victim was underlined by the testimony of other witnesses. The opinion of lay persons contained in her DCYS file that she was not always truthful was simply cumulative of the testimony at trial and would have added nothing of significance to the defendant's case. The trial court did not err in concluding that nondisclosure of the DCYS file did not impair the defendant's constitutional right of confrontation.

## V

The defendant's fifth claim of error is that he was denied a fair trial, due process of law and the right of confrontation under the federal and state constitutions by the state's allegedly improper rebuttal argument to the jury that the defendant should have called the victim's social worker as a witness. During her cross-examination, the victim was asked by defense counsel whether she had told anyone else about those details concerning the incident which she had failed to include in her police statement. She responded that she had told her social worker, who was counseling her as part of her DCYS treatment, about everything which she had testified to in court.

During rebuttal argument, the state argued that the defendant would have called the victim's social worker

if the version of the events given by the victim to her social worker differed from her direct testimony.[11] The defendant claims that this was an improper argument because the state knew that any communication between the victim and her social worker was privileged under General Statutes § 17-431 (b).[12] Defense counsel did not object to the state's argument at trial. The defendant claims, however, that because the comments made by the prosecutor implicated his fundamental constitutional rights to due process and confrontation, this court should review his claims under *State* v. *Evans,* supra.

Our Supreme Court has held on several occasions that "where a criminal defendant does not object and take exception to allegedly prejudicial remarks of the state's attorney, either at the time they were made or at the close of argument, he waives his right to press the claimed error on appeal. *State* v. *Lubesky,* 195 Conn. 475, 484, 488 A.2d 1239 (1985); *State* v. *Malley,* 167 Conn. 379, 387, 355 A.2d 292 (1974)." *State* v. *Tyler-Barcomb,* 197 Conn. 666, 673, 500 A.2d 1324 (1985). Furthermore, where defense counsel does not ask the

[11] The relevant remarks by the prosecutor during summation to the jury are as follows: "And I recall very vividly that the girl was asked if she told anybody else about the urine and she did. She gave a name. Do you remember she said she didn't want to give her the name of her therapist? Asked the Judge if she had to? And she said yes, it was [her social worker] she told. Do you remember that? Did he subpoena [her social worker] in? No, of course not. Be very easily disproved if he did put [her social worker] on the stand and ask her if she ever told her the Defendant urinated. Didn't happen, did it?"

[12] General Statutes § 17-431 (b) states in pertinent part: "Neither the commissioner of children and youth services nor any of his employees shall disclose or transmit, in whole or in part, the nature or content of any communications or records of any person to any other individual, corporation or municipal, state or federal agency, without the consent of the person, his attorney or his authorized representative . . . ." The statutory privilege of General Statutes § 17-431 (b) rests with the person committed to DCYS. It is unnecessary for the purposes of this opinion to determine whether that statute and General Statutes § 17-47a are facially inconsistent.

trial court for a curative charge or move for a mistrial, our Supreme Court has ruled that defense counsel did not view the comments by the prosecutor as so prejudicial as to warrant a determination that the defendant's right to a fair trial was seriously impaired. *State* v. *Tyler-Barcomb,* supra; *State* v. *Lubesky,* supra, 483–84; *State* v. *Falcone,* 191 Conn. 12, 22–23, 463 A.2d 558 (1983). In this case, the defendant fails to mention in his claim that it was defense counsel who first raised the issue of the social worker's failure to testify in his closing argument to the jury.[13] The comments by the state were made in response to defense counsel's own attempt to use the social worker's failure to testify to the defendant's advantage. Under these circumstances, the defendant cannot be allowed to complain about this issue on appeal. Nor was the issue of the existence of the statutory privilege, and whether it would be asserted or waived, ever raised at trial. The defendant has not shown that he was deprived of a fundamental constitutional right and a fair trial under *State* v. *Evans,* supra. See *State* v. *Tyler-Barcomb,* supra, 673–74.

## VI

The defendant's sixth claim of error is that the trial court erred in prohibiting the defendant from introduc-

---

[13] The relevant remarks by defense counsel during closing argument to the jury are as follows: "If she had told her social worker this had happened, her social worker would have testified to that on the witness stand. The first time she ever mentioned that she was slapped was when she—and that this man urinated on her was when she got on the witness stand that day. I don't know if it is a fantasy she had or some other case she heard about or something somebody suggested to her; but it was certainly something that she—was not a consistent statement. Was certainly something she had never ever mentioned before. Why would she tell Mr. Malone if she was rather than Miss Graves, Officer Graves, which she had a continuing relationship with, who was—who she felt at ease with or her social worker or somebody of that nature. Why would she tell Mr. Malone a perfect stranger that this happened the first time if she just didn't invent it that particular time to make this case sting or to emphasize this."

ing testimony regarding the victim's prior sexual experiences. At trial, the defendant called as a witness the girlfriend of the victim, who had accompanied her when she left her home on the night of the incident, and had known the victim for two to three years. The witness was asked if the victim had ever discussed her prior sexual experiences. The trial court sustained the state's objection to the question on the ground that the testimony was irrelevant and immaterial to the charge of risk of injury to a child under General Statutes § 53-21.[14] The defendant argues that a victim's prior sexual experiences are relevant to a risk of injury charge.

General Statutes § 53-21 proscribes "two general types of behavior likely to injure physically or impair the morals of a minor under sixteen years of age: '(1) deliberate indifference to, acquiescence in, or the creation of situations inimical to the minor's moral or physical welfare' and '(2) acts directly perpetrated on the person of the minor and injurious to [her] moral or physical well-being.' " *State* v. *Perruccio,* 192 Conn. 154, 159, 471 A.2d 632, appeal dismissed, 469 U.S. 801, 105 S. Ct. 55, 83 L. Ed. 2d 6 (1984), quoting *State* v. *Dennis,* 150 Conn. 245, 250, 188 A.2d 65 (1963). In both instances, the focus of the statute is on the behavior of the defendant, not on the character, history or experience of the victim. See *State* v. *Pickering,* 180 Conn. 54, 63–65, 428 A.2d 322 (1980).

The relevant inquiry was whether the defendant did any act or created a situation which was likely to impair the health or morals of the victim. The defend-

[14] General Statutes § 53-21 provides: "Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired, or does any act likely to impair the health or morals of any such child, shall be fined not more than five hundred dollars or imprisoned not more than ten years or both."

ant attempted to introduce evidence regarding the prior sexual experiences of the victim in order to demonstrate that her morals were not impaired by the defendant's conduct and, thus, that there was no injury to the victim in this case. Under the statute, however, injury is not an element of the offense. See *State* v. *Perruccio,* supra, 159–60; *State* v. *McCall,* 187 Conn. 73, 91, 444 A.2d 896 (1982); *State* v. *Dennis,* supra, 250. To allow the introduction of evidence regarding the victim's prior sexual experiences would divert the attention of the jury from the conduct of the defendant to the history of the minor. The effect of allowing such evidence would be to afford a lesser degree of protection to some minors than others, a result which is nowhere supported by either the language or the history of the statute or by the cases decided under it. The prior sexual experiences of the victim, therefore, were not relevant to the charge of risk of injury to a minor. See *State* v. *Franko,* 199 Conn. 481, 484–86, 508 A.2d 22 (1986) (trial court did not err in prohibiting the defendant from asking the victim on cross-examination whether she had been a virgin prior to the alleged sexual assault, the defendant having failed to establish that the testimony was relevant to a material issue in the case). The trial court in this case properly excluded the testimony.[15]

## VII

The defendant's next claim of error is that the trial court erred by permitting the state on redirect exami-

---

[15] We are not persuaded by the defendant's attempt to characterize the holdings in two Supreme Court cases; *State* v. *Storlazzi,* 191 Conn. 453, 464 A.2d 829 (1983), and *State* v. *McCall,* 187 Conn. 73, 444 A.2d 896 (1982); as inconsistent. The defendant bases this argument on a comparison of the Supreme Court's quotation of the jury charge on risk of injury to a minor in *Storlazzi* with the court's comparison of the elements of risk of injury and sexual assault in the second degree in *McCall.* In neither case did the Supreme Court address the precise issue of whether evidence of the victim's prior sexual experiences should be allowed in a case of risk of injury to a minor. Unlike the defendant, we do not presume that the court's decisions are inconsistent, especially where the Supreme Court did not directly address the subject at issue in this case.

nation to elicit testimony from the victim regarding portions of her statement to the police. On cross-examination, defense counsel examined the witness with regard to certain details of her direct testimony which were not included in her prior statement in an attempt to illustrate the inconsistencies between the witness' statement and her direct testimony. On redirect examination, the state, after the defendant's objection was overruled and exception made by defense counsel, brought out those items in the victim's statement which were consistent with her direct testimony. On appeal, the defendant argues that the trial court erred by allowing the state to examine the victim on those portions of her statement which were consistent with her direct testimony, instead of limiting the scope of the redirect testimony to the inconsistencies brought out on cross-examination. The defendant claims that any attempts to rehabilitate the witness' testimony should have been limited to the subject matter of the prior inconsistent statements developed on cross-examination.

The general rule is that a witness' prior consistent statements are inadmissible at trial. *State* v. *Brown,* 187 Conn. 602, 607, 447 A.2d 734 (1982); *State* v. *Dolphin,* 178 Conn. 564, 568, 424 A.2d 266 (1979). "Nonetheless, the above rule is not absolute. Connecticut, as many other jurisdictions, long has recognized that where there is testimony showing an inconsistent statement by a witness it is within the discretion of the trial court to permit the introduction of prior consistent statements of that witness, not as proof of the matters asserted therein, but for the limited purpose of rehabilitating the witness." *State* v. *Dolphin,* supra, 569; see also *State* v. *Brown,* supra, 608; *State* v. *McCarthy,* 179 Conn. 1, 18, 425 A.2d 924 (1979). The defendant, after selecting those portions of the witness' statement which he wished to emphasize on cross-examination, would now, in effect, have this court allow

the alleged inconsistencies to be isolated and taken out of context. See *State* v. *Cardona*, 6 Conn. App. 124, 130, 504 A.2d 1061 (1986). The trial court's ruling properly allowed the state to ask the victim certain questions, all of which pertained to the same prior statement of the witness. We conclude that the trial court did not abuse its discretion in permitting the state to examine the victim on redirect regarding her prior statement for the limited purpose of rehabilitating her after she had been impeached by defense counsel.

## VIII

The defendant's final claim of error is that the trial court erred in denying his request to charge the jury on the issue of consent in connection with its charge concerning risk of injury to a minor.[16] Since the trial of this case, it has been held to be error for a trial court to deny a defendant's request for a jury instruction on the issue of consent in a risk of injury case involving a fifteen year old girl. *State* v. *Perruccio*, supra, 165–66. At the time *Perruccio* was announced, the defendant had not yet been convicted. Since judgment had not yet been rendered, there was no final judgment at the time *State* v. *Perruccio* was decided. We, therefore, conclude that the holding in that case is applicable here. See *State* v. *Cohane*, supra, 483–84; *State* v. *Dudla*, 190 Conn. 1, 5, 458 A.2d 682 (1983).

[16] In its charge to the jury on the issue of consent as it related to the risk of injury count, the trial court stated: "If you were to find the facts as the victim has stated them to be, that very well might constitute an act of risk of injury. If you were to find that even though she might have consented, it would still be unlawful to do this. So the victim cannot consent to a risk of injury situation. And if you find that by having vaginal intercourse with the Defendant, even if she acquiesced in it, she's legally incompetent to acquiesce. So, if you find that the Defendant caused the victim to have sexual relations with him, or if you find that he permitted her to have sexual relations with him, and you were to find that sexual relations were such that the victim's morals are likely to be impaired, or that this was an act, and you can do it in the alternative, it doesn't make any difference which way you do it, likely to impair the health or morals of the victim, then you would have to find that there was a risk of injury."

The state claims that the trial court's failure to give the requested instruction, if deemed to be error at all, was harmless error under the circumstances in this case. The state's position is that the jury's finding of nonconsent on the part of the victim to the sexual intercourse alleged in the sexual assault charge automatically establishes a finding of nonconsent to acts within the risk of injury charge.

In order to convict under the risk of injury statute, the state must prove that the defendant either placed the victim in a situation or committed an act likely to impair the morals or health of a child under the age of sixteen. See *State* v. *McCall*, supra. The defendant was not charged with a violation of the risk of injury statute for any specific act. Contrary to the state's argument, risk of injury and sexual assault "do not stand in the relation of greater to lesser included offenses. Each requires proof of an element not required by the other." Id., 91. For this reason, our Supreme Court has recognized that the element of likelihood of impairment of the morals or health of a child necessary in a risk of injury charge is not a necessary corollary of sexual intercourse. Id., 91–92. Thus, merely because the jury found that the victim did not consent to the sexual intercourse alleged in the sexual assault charge does not necessarily mean that it would have similarly found that the victim did not consent to any of the actions that could have been found to be within the risk of injury statute.

It has been recognized that a charge of risk of injury can include a host of possibilities and a multitude of acts. See *State* v. *Eason*, 192 Conn. 37, 470 A.2d 688 (1984). Thus, several acts of the defendant could have been found by the jury to be within the realm of the broad risk of injury statute. These include, but are not limited to, the act of the defendant in taking the victim away in his car, the kissing of the victim, or the

touching of the victim. Moreover, the jury could have found that the victim had consented to any or all of these acts, although she did not consent to sexual intercourse. The jury was prevented from doing so, however, because of the trial court's instruction pursuant to which they were bound to find the defendant guilty of risk of injury whether or not they believed his version of these facts, and whether or not they found that the victim had consented to any of these acts, once they concluded that the victim had not consented to sexual intercourse.

Such an error may be considered harmless only if the evidence against the defendant is so overwhelming that this court may conclude that the jury's verdict was not influenced by the absence of a proper instruction on the issue of consent. See *State* v. *Cohane,* supra, 485. The record in the present case does not indicate that the evidence against the defendant on the issue of consent met this requirement.

Whether the defendant committed and whether the victim consented to the requisite acts of a risk of injury violation were questions of fact for the jury. *State* v. *Perruccio,* supra, 165. Likewise, whether any action of the defendant fell within the proscription of the risk of injury statute was also a question for the jury to decide. We cannot assume on appellate review that the jury would consider the sexual intercourse to be the activity falling under the risk of injury charge. Such an assumption would be a usurpation of a function within the exclusive province of the jury. See *State* v. *Silver,* 139 Conn. 234, 246, 93 A.2d 154 (1952).

We note that, on the basis of the same set of facts and with proper jury instructions, the jury found this defendant not guilty of the charge of kidnapping. It is therefore possible that the jury might have found the defendant not guilty of the risk of injury charge as well.

In order to have done so, however, the jury would have to have been properly and completely instructed on the law to be applied in resolving such questions. Under these circumstances, we cannot conclude that the state has demonstrated beyond a reasonable doubt that the jury was not influenced by the improper instruction. Thus, the trial court's failure to give the requested instruction on consent constitutes reversible error.

There is error, the judgment is set aside and the case is remanded for a new trial.

In this opinion the other judges concurred.