## STATE OF CONNECTICUT *v.* LEROY SCOTT
## (4674)

BORDEN, SPALLONE and BIELUCH, Js.

Argued February 3—decision released May 26, 1987

*Temmy Ann Pieszak,* assistant public defender, with whom, on the brief, was *Joette Katz,* public defender, for the appellant (defendant).

*Judith Rossi,* deputy assistant state's attorney, with whom, on the brief, were *James G. Clark,* assistant state's attorney, and *Thomas V. O'Keefe,* former assistant state's attorney, for the appellee (state).

BORDEN, J. The defendant appeals from the judgment of conviction, after a jury trial, of two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a), one count of assault in the third degree in violation of General Statutes § 53a-61 (a) (1), and one count of larceny in the second degree in violation of General Statutes §§ 53a-119 and 53a-123 (a) (3). He claims that the court erred (1) in denying his motion in limine, which sought to preclude the state from cross-examining him regarding other sexual misconduct, (2) in refusing to charge that the state was required to prove, as an essential element of the sexual assault charges, that the defendant and the victim were not married to each other, and concomitantly, in refusing to rule that proof of that claimed essential element was lacking, and (3) in permitting the jury to consider two factual bases for the larceny verdict, one of which was not proven beyond a reasonable doubt. We find no error.

The jury could reasonably have found the following facts. Late in the evening of Monday, August 13, 1984, the defendant picked up the victim in New Haven while she was hitchhiking. The victim was wearing jeans and a tee shirt, and was not carrying a purse. She had a silver ring on her finger, and was carrying a key ring with a turquoise ring attached to it. The defendant drove the victim to the top of the New Haven Coliseum parking garage, where he stripped her of her clothing, hit her and forced her to submit, in the car, to vaginal

intercourse and fellatio. Thereafter, while the victim was naked and outside the car, the defendant kicked her and knocked her down. In response to her request, he gave her back her jeans and then drove away. A subsequent search of the defendant's bedroom yielded the victim's two rings.

I

The defendant first claims that the court erred in denying his motion in limine which attempted to preclude the state from cross-examining him about his presence with a woman at the Coliseum parking garage on the night after the assault on the victim. Specifically, he claims that the court erred by failing to rule in advance that the state was limited in its cross-examination of the defendant to the scope of his proposed direct testimony, and by ruling that the state could cross-examine him concerning a specific act of sexual misconduct. We disagree.

This claim arose in the following procedural context. The defendant was employed at the Coliseum garage. Following his arrest, he was interviewed by the New Haven police. He denied involvement in the assault on the victim, which took place on Monday, August 13, 1984. He also stated to the police, however, that on the following evening, Tuesday, August 14, 1984, he had taken a woman to level A of the garage where he engaged in consensual sexual relations with her.

By his motion in limine, the defendant sought a ruling from the court that would prohibit the state from cross-examining him about this event if he testified on his own behalf. Defense counsel represented that it was her intention, on direct examination of the defendant, not to ask any questions about Tuesday, August 14, the night following the alleged attack, about girlfriends, or about frequenting the garage for sexual purposes. Therefore, the defendant argues, the court should have

ruled that the state was prohibited from cross-examining him about his presence at the garage the following evening with another woman. The state indicated that, if the defendant testified, it intended to cross-examine him about his presence at the Coliseum on Tuesday evening and who was with him. It did not, however, intend to ask him about his sexual conduct with the woman. The basis of the defendant's argument was twofold: (1) the state's cross-examination would exceed the scope of the defendant's proposed direct examination; and (2) even with the state's intended limitation, the evidence would implicitly bring into play the defendant's sexual conduct with another woman, in violation of the Supreme Court's decision in *State* v. *Rothenberg,* 195 Conn. 253, 262, 487 A.2d 545 (1985), and the prejudicial effect of the evidence would outweigh its probative value. The court denied the defendant's motion. The defendant promptly stated that, in view of the court's ruling, he would not testify, and invited the court to reconsider its ruling. The court declined to do so.

We first consider the defendant's claim that the court's ruling violated the rule confining cross-examination of a witness to the scope of the direct examination. We conclude that the court acted within its discretion in rejecting the claim of the defendant because the procedure employed by the defendant, namely, a motion in limine, was an inappropriate vehicle for adequately presenting to us the question of the propriety of the trial court's ruling.

The procedure employed by the defendant was obviously based on the procedures approved by the Supreme Court in cases such as *State* v. *Binet,* 192 Conn. 618, 473 A.2d 1200 (1984), *State* v. *Iasevoli,* 188 Conn. 325, 449 A.2d 996 (1982), and *State* v. *Nardini,* 187 Conn. 513, 447 A.2d 396 (1982), and by this court in *State* v. *Sergi,* 7 Conn. App. 445, 509 A.2d 56, cert.

denied, 201 Conn. 806, 515 A.2d 380 (1986), *State* v. *Garcia,* 7 Conn. App. 367, 509 A.2d 31 (1986), and *State* v. *Murrell,* 7 Conn. App. 75, 507 A.2d 1033 (1986). In those cases, the defendants were permitted to seek a ruling, prior to their direct examination, on whether certain of their prior convictions would be admissible on cross-examination to impeach their credibility. Those cases did not, however, involve the quite different question of whether certain proffered cross-examination would be within the scope of the defendant's proffered direct examination. Nor are we aware of any cases approving use of the motion in limine as a vehicle to challenge potential cross-examination as outside the scope of what is only inchoate direct examination. Thus, the defendant's reliance on the *Binet, Iasevoli* and *Nardini* line of cases was unjustified.[1]

Our Supreme Court subsequently, and prospectively, disapproved of that procedure, and now requires "that to 'raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify.' *Luce* v. *United States,* [469 U.S. 38, 43, 105

---

[1] The defendant cannot now complain that he was misled by the trial court's acquiescence to the motion in limine procedure. First, it was he, not the trial court, who pressed the procedure to a ruling. Second, his written motion in limine by its terms did not give either the state or the court notice that he sought to preclude potential cross-examination of the defendant on the basis of the scope of his potential direct examination. The motion and its proposed order was aimed only at precluding cross-examination of the defendant "about other crimes or other acts of misconduct," and sought only to obtain from the court a determination of "whether the probative value of the proffered evidence outweigh[ed] [its] prejudicial effect . . . ." It was only at the end of the defendant's oral argument on this motion that he introduced the additional argument that the potential cross-examination would exceed the scope of his proffered direct examination.

Nor can the defendant complain that we are in effect applying *State* v. *Harrell,* 199 Conn. 255, 506 A.2d 1041 (1986), retroactively. As is noted in the text, supra, the procedures formally approved for challenging cross-examination by use of prior convictions have never been approved for challenging cross-examination based on the scope of nonexistent direct examination.

S. Ct. 460, 83 L. Ed. 2d 443 (1984)]." *State* v. *Harrell,* 199 Conn. 255, 265–66, 506 A.2d 1041 (1986).[2] The reasons for this new rule requiring the defendant to testify in order to challenge impeachment evidence are to supply the reviewing court with a complete record, thus permitting it to gauge the possible impact of the impeachment evidence on the verdict, and to apply a factual context within which a reviewing court can gauge the propriety of the trial court's action in performing its subtle, balancing-type evidentiary rulings. Id., 266.

The same reasoning applies with even more force to the defendant's attempt, in advance of any direct examination, to bar cross-examination beyond the scope of the intended direct examination. Although cross-examination is restricted to the matters covered in direct examination, except insofar as the cross-examination relates to credibility; *State* v. *Sharpe,* 195 Conn. 651, 657, 491 A.2d 345 (1985); such restriction rests in the trial court's sound discretion. Id. A question on cross-examination is within the scope of the direct examination "if it is designed to 'rebut, impeach, modify, or explain any of the defendant's direct testimony.' " Id., quoting *State* v. *Zdanis,* 173 Conn. 189, 196, 377 A.2d 275 (1977). In determining whether cross-examination is within the scope of the direct examination, "the trial court is allowed a liberal discretion . . . ." *Akers* v. *Singer,* 158 Conn. 29, 36, 255 A.2d 858 (1969).

Given this discretion laden and fact bound standard, it is clear that a proper appellate determination of whether a trial court has erred in permitting a particular question or line of inquiry to be attacked on cross-examination can only be made upon " 'a complete rec-

[2] This case was tried before *State* v. *Harrell,* 199 Conn. 255, 506 A.2d 1041 (1986), was decided.

ord detailing the nature of [the defendant's] testimony, [and] the scope of the [direct] examination . . . . ' " *State* v. *Harrell,* supra, 266, quoting *Luce* v. *United States,* supra, 41. Without such a record, we are "particularly 'handicapped in any effort to rule on subtle evidentiary questions outside a factual context.' " Id. In order to accomplish this task, we " 'must know the precise nature of the defendant's testimony which is unknowable when . . . the defendant does not testify.' " Id.

The assertion in this case by defense counsel that she did not intend to ask the defendant about the Tuesday night incident, about his girlfriends or about frequenting the garage for sexual purposes, cannot supplant the appellate requirement of an adequate trial record. The fact that she may not have intended to ask him such questions does not foreclose the possibility that, in answering other questions which she did ask, the defendant may have responded in such a way as to permit the trial court to exercise its broad discretion and permit the state to inquire about the Tuesday night occurrence and about his presence there with a woman. We have no way of knowing, nor could the trial court, what the scope of the defendant's direct examination would have been, and whether, even with such limited questions directed to him by his counsel, his testimony would have embraced within its scope the proffered cross-examination by the state. Nor, for that matter, do we have any basis on which to know precisely what the state's cross-examination would have been and whether, even if erroneously admitted, it would have been harmful enough to require reversal.

We turn, therefore, to the defendant's further claims of error in this regard. The defendant claims that the court's in limine ruling (1) improperly permitted cross-examination of the defendant concerning an act of sexual conduct, in violation of what the defendant claims

to be the holding of *State* v. *Rothenberg,* supra, (2) improperly permitted the state to place the defendant's character in issue, and (3) deprived him of his constitutional right to testify and to present a defense. The defendant's claims, however, present an analysis unburdened by the law or by the facts in the record.

First, the defendant reads too expansively the language in *State* v. *Rothenberg,* supra, on which he relies. Our Supreme Court stated in *Rothenberg* "that sex crime defendants, like sex crime victims, should be shielded from unnecessarily prejudicial evidence of their prior sexual conduct." Id., 262. This language is dictum, and is not the holding of the case. See id., 262–63. Our examination of the law discloses that subsequent to *Rothenberg* our Supreme Court has not seen fit to apply or even to repeat its broad language. See, e.g., *State* v. *Morowitz,* 200 Conn. 440, 444–47, 512 A.2d 175 (1986). Furthermore, even the dictum in *Rothenberg* would not shield a defendant from evidence of *any* prior sexual conduct, but only from "unnecessarily prejudicial evidence of [his] prior sexual conduct." *State* v. *Rothenberg,* supra, 262. Thus, all that the broad *Rothenberg* language does is return the court to its traditional function of balancing the probative value of evidence against its prejudicial effect.

Second, it is equally clear that the evidence which the defendant sought to exclude would not have contained any reference to sexual conduct of the defendant. The state agreed to refrain from eliciting that part of the defendant's statement.

Third, even if, as the defendant argues, the jury was to infer from the defendant's statement that on Tuesday evening he was in fact engaging in sexual conduct with another woman in the garage, we are hard pressed to conclude that it would constitute evidence of the kind of serious misconduct of the defendant which would

require a conclusion that its prejudicial effect out-weighed its probative value. There certainly is no sug-gestion that the defendant's Tuesday evening encounter involved forcible sex. Although the notion of consensual sex in a car in a public garage at night may offend good taste, we can hardly attribute, to a jury in today's age, such prejudice from it that would require its exclusion on this record.

## II

The defendant's next two claims concern his convic-tion of two counts of sexual assault in the first degree, in violation of General Statutes § 53a-70 (a).[3] Because these two claims of the defendant are intertwined, we address them together. The defendant claims that the trial court erred by failing to charge the jury, in accord-ance with his request to charge, on the definition of the term "sexual intercourse." His request to charge included the statutory definition of the term, includ-ing the last sentence of that definition: "Its meaning is limited to persons not married to each other." Gen-eral Statutes § 53a-65 (2); see footnote 3, infra. The court did give the pertinent parts of the statutory defi-nition of the term, but did not include the last sentence of the definition in its charge to the jury. The defend-ant also claims that the state's proof was deficient

---

[3] General Statutes § 53a-70 (a) provides in pertinent part: "A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person . . . ."

General Statutes § 53a-65 (2) defines "sexual intercourse" as follows: " 'Sexual intercourse' means vaginal intercourse, anal intercourse, fella-tio or cunnilingus between persons regardless of sex. Penetration, how-ever slight, is sufficient to complete vaginal intercourse, anal intercourse or fellatio and does not require emission of semen. Penetration may be com-mitted by an object manipulated by the actor into the genital or anal open-ing of the victim's body. Its meaning is limited to persons not married to each other."

because it did not establish beyond a reasonable doubt that the defendant and the victim were not married to each other.

The defendant argues that, by virtue of the last sentence of the definition of "sexual intercourse"; see footnote 3, supra; the absence of a marital relationship between the defendant and the victim is an essential element of the crime of sexual assault in the first degree, and that the court's failure to charge on that element was error of both constitutional and nonconstitutional dimensions. We disagree. We conclude that the absence of a marital relationship between the defendant and the victim is *not* an essential element of the crime of sexual assault in the first degree. Therefore, the court did not err in omitting from its charge that portion of the statutory definition referring to nonmarriage between the defendant and the victim, and the state was not required to establish the lack of a marital status as part of its case-in-chief.

The distinction between an essential element of an offense and an exemption from, or an exception or defense to, prosecution for an offense is well known in our law. See, e.g., *State* v. *Januszewski,* 182 Conn. 142, 165–66, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981); *State* v. *Tinsley,* 181 Conn. 388, 402–403, 435 A.2d 1002 (1980), cert. denied, 449 U.S. 1086, 101 S. Ct. 874, 66 L. Ed. 2d 811 (1981). The state bears the burden of proving all essential elements beyond a reasonable doubt. Id., 165. With respect to an exception, exemption or defense, however, the defendant bears the initial burden of producing evidence of the applicability of the exception, exemption or defense, and the state then bears the burden to disprove it beyond a reasonable doubt. Id.; see General Statutes § 53a-12 (a). "Whether the existence of some fact is an essential element of a crime depends upon whether the existence

of that fact forms a part of the conduct prohibited by the statute; that is, whether the fact in question is part of the corpus delicti." *State* v. *Januszewski, supra.* On the basis of the common law and statutory history from which General Statutes §§ 53a-65 and 53a-70 (a) evolved, the logic of the various provisions of the sexual assault statutes, and case law in other jurisdictions, we conclude that the absence of a marital relationship between the defendant and the victim of a sexual assault is not an essential element of the crime. Rather, the existence of a marital relationship can be raised as an exemption or defense to prosecution for sexual assault in the first degree under § 53a-70 (a).

The common law principle that a man could not be guilty of raping his wife "is traceable to a statement made by the 17th century English jurist Lord Hale, who wrote: '[T]he husband cannot be guilty of a rape committed by himself upon his lawful wife, for by their mutual matrimonial consent and contract the wife hath given up herself in this kind unto her husband, which she cannot retract.' (1 Hale, History of Pleas of the Crown, p. 629)." *People* v. *Liberta,* 64 N.Y.2d 152, 162, 474 N.E.2d 567, 485 N.Y.S.2d 207 (1984); see also note, "Abolishing the Marital Exemption For Rape: A Statutory Proposal," 1983 U. Ill. L. Rev. 201, 202 (hereinafter "Abolishing the Marital Rape Exemption").[4] The first case in this country recognizing the marital exemption for rape was *Commonwealth* v. *Fogerty,* 74 Mass.

---

[4] The theories underlying the marital exemption have been thoroughly discussed and discredited. See *People* v. *Liberta,* 64 N.Y.2d 152, 474 N.E.2d 567, 485 N.Y.S.2d 207 (1984); note, "Abolishing the Marital Exemption for Rape: A Statutory Proposal," 1983 U. Ill. L. Rev. 201. Although our legislature has not seen fit to abolish the exemption for purposes of prosecution pursuant to General Statutes § 53a-70, it has accomplished the same end by enacting General Statutes § 53a-70b, which prohibits forcible sexual intercourse between spouses or cohabitors. See *State* v. *Preyer,* 198 Conn. 190, 195–98, 502 A.2d 858 (1985).

(8 Gray) 489 (1857), in which the court held that a rape indictment need not allege that the victim was not married to the defendant, and stated in dictum that the defendant could raise marriage as a defense. See "Abolishing the Marital Rape Exemption," supra. The common law defined rape as " 'carnal knowledge of a woman forcibly and against her will.' " Id., 206 n.29, quoting 4 W. Blackstone, Commentaries p. 210. The general rule at common law was that the lack of marital status between the defendant and victim was not an essential element of the crime of rape, and that such a marriage was a matter of defense; 65 Am. Jur. 2d, Rape § 50, p. 788; see, e.g., *State* v. *Smith*, 85 N.J. 193, 197–98, 426 A.2d 38 (1981) (referring to the common law "exemption" as a "defense"); *Commonwealth* v. *Chretien*, 383 Mass. 123, 127–28, 417 N.E.2d 1203 (1981) (referring to the "spousal exclusion" and "common law exception"); *Warren* v. *State*, 255 Ga. 151, 153–56, 336 S.E.2d 221 (1985) (referring to the "marital rape exemption" and "common law spousal exclusion"); although there were some courts which held, based on their states' statutory definitions, that lack of marriage was an essential element of the crime. 65 Am. Jur. 2d, supra.

The defendant claims that Connecticut's history establishes a departure from the widely prevailing view at common law. He argues that Connecticut's common law rule was that nonmarriage of the defendant and the victim was an essential element of the crime of rape. We disagree. Although the historical evidence is murky, we read our history to establish that in Connecticut the issue of marriage vel non between the defendant and the victim of a sexual assault was treated in conformity with the general course of the common law elsewhere.

Although we have found no Connecticut cases specifically holding that at common law Connecticut

adopted the marital exemption, Chief Justice Zephaniah Swift stated, in his famous Digest, that "a husband cannot by law be guilty of ravishing his wife, on account of the matrimonial consent which she cannot retract . . . . " 2 Z. Swift, Digest (1823) p. 295. It is significant that the theory of constructive consent on which Swift relied was precisely that posited by Lord Hale in the seventeenth century from which the marital exemption emanated. Swift's dictum was obviously based on Hale's, which was generally understood to create a defense or exemption for the husband defendant. There is nothing in our common law history to compel the conclusion that Connecticut's view of the allocation of the burdens of proof and production arising from the marital exemption differed from the view prevailing in the other states. We therefore conclude that the Connecticut law as stated by Swift also created a marital defense or exemption, and did not define nonmarriage as an essential element of the crime of rape.

We are not persuaded by the cases on which the defendant relies for his historical reading. *Swanson* v. *Swanson,* 128 Conn. 128, 130, 20 A.2d 617 (1941), was a divorce case, and held only that conviction of the husband of the crime of assault to commit rape of another woman was an infamous crime involving a violation of conjugal duty so as to be a proper ground of divorce. *Rookey* v. *State,* 70 Conn. 104, 114–15, 38 A. 911 (1897), held in pertinent part only that attempted rape was a lesser included offense of the crime of rape. *State* v. *Wells,* 31 Conn. 210, 213 (1862), held that an information charging that the defendant forcibly assaulted the victim, "a single woman," with intent violently and feloniously to ravish and carnally know her, was sufficient. None of these cases can be read to say that the marital exemption for rape required the state to prove marriage as an essential element of the crime of rape.

The Penal Code, which became effective in 1971, incorporated the marital exemption in its definitions. As first enacted, the Code treated forcible vaginal sexual intercourse and forcible anal or oral sexual intercourse in separate but parallel sections. Forcible vaginal intercourse was labelled "rape," which was divided into two degrees. General Statutes (Rev. to 1972) §§ 53a-72, 53a-74. Forcible anal or oral intercourse was labelled as "deviate sexual intercourse," which was also divided into two degrees. General Statutes (Rev. to 1972) §§ 53a-75, 53a-76.

Rape in the first degree was defined as follows: "(a) A male is guilty of rape in the first degree when he engages in sexual intercourse with a female: (1) By forcible compulsion; or (2) who is incapable of consent by reason of being physically helpless; or (3) who is less than fourteen years of age." General Statutes (Rev. to 1972) § 53a-72.[5] The term "sexual intercourse" referred to vaginal intercourse, and was defined as follows: " 'Sexual intercourse' has its ordinary meaning and occurs upon any penetration, however slight. Its meaning is limited to persons not married to each other." General Statutes (Rev. to 1972) § 53a-65 (1). A "female" was defined as "any female person who is not married to the actor." General Statutes (Rev. to 1972) § 53a-65 (4).

The definition of "female" as one "who is not married to the actor," and the limitation on the definition of "sexual intercourse" to "persons not married to each other," might at first glance suggest that, under the code as initially enacted, nonmarriage was an essential element of the crime of rape. We do not believe that to be the case for several reasons.

---

[5] Rape in the second degree involved sexual intercourse with a female incapable of consent by reason of factors other than age, or sexual intercourse between a male eighteen years old or more and a female less than sixteen years old. General Statutes (Rev. to 1972) § 53a-74.

First, it is clear that these definitions were meant to incorporate the historical common law marital exemption, which was generally understood to be a defense.

Second, under the code as initially enacted, and at present, there is an affirmative defense of cohabitation. The statute provides an affirmative defense "that the defendant and the alleged victim were, at the time of the alleged offense, living together by mutual consent in a relationship of cohabitation as man and wife, regardless of the legal status of their relationship." General Statutes (Rev. to 1972) § 53a-67 (c). The purpose of this affirmative defense is that "[p]arties not legally married to each other but living together as man and wife are *treated the same as married persons.* The rationale is that the same elements of privacy, consent and intimacy of relationship are likely to be present here as in the marriage situation." (Emphasis added.) Commission to Revise the Criminal Statutes, Penal Code Comments, p. 27. Thus, the fact that a defendant who seeks to avail himself of the principle of cohabitation would have to establish that affirmative defense by a preponderance of the evidence; General Statutes § 53a-12 (b); suggests also that a similarly treated defendant who seeks to avail himself of the marital exemption would have to raise his marital status as a defense. General Statutes § 53a-12 (a).

Third, closely analogous precedents strongly suggest that, despite the code's somewhat loose wording, it was not meant to engraft an additional essential element onto the common law definition of rape. Our Penal Code definitions regarding sexual offenses "are taken largely from the New York Revised Penal Law." Commission to Revise the Criminal Statutes, Penal Code Comments, p. 25. Therefore, New York case law interpreting their statutes is persuasive. In *People* v. *Liberta,* supra, the New York Court of Appeals considered the constitu-

tionality of New York's Penal Law provisions in the context of a prosecution of a husband for forcibly raping his wife. The court consistently referred to the fact that under the Penal Law the husband could not be convicted of forcibly raping his wife as "a marital exemption." Id., 162–67. Other jurisdictions which have been faced with the issue have also refused to recognize nonmarriage as an essential element of the crime of rape. In *State* v. *Bell,* 90 N.M. 134, 140, 560 P.2d 925 (1977), the court held that, where the statute defined criminal sexual penetration as "unlawful . . . causing of a person, other than one's spouse, to engage in sexual intercourse," lack of marriage between the defendant and victim was not an essential element of the offense. See also *Commonwealth* v. *Chretien,* supra, 130 n.6 ("[t]he usual means of incorporating the spousal exclusion into modern rape statutes is to insert the words 'not his spouse' immediately following the words 'a person' or 'another person' ").

In 1975, the Connecticut legislature revised the sexual offense sections of the Penal Code. Public Acts 1975, No. 75-619. That revision eliminated the separate definitions of vaginal intercourse and oral or anal intercourse, and substituted one comprehensive definition of "sexual intercourse": " 'Sexual intercourse' means vaginal intercourse, anal intercourse, fellatio or cunnilingus between persons regardless of sex. Penetration, however slight, is sufficient to complete vaginal intercourse, anal intercourse or fellatio and does not require emission of semen. Penetration may be committed by an object manipulated by the actor into the genital or anal opening of the victim's body. Its meaning is limited to persons not married to each other." General Statutes § 53a-65 (2). This statutory revision rendered the sexual offense statutes gender neutral. No longer are victims referred to as females. One obvious purpose of the revised statutory scheme

was to refer to male and female victims in the same terms. Indeed, the prior definition of "female" as "any female person who is not married to the actor"; General Statutes (Rev. to 1972) § 53a-65 (4); was eliminated entirely.

The only reference in the definition of "sexual intercourse" to the nonmarriage of the victim and the actor was carried forward from the prior definition of "sexual intercourse": "Its meaning is limited to persons not married to each other." General Statutes § 53a-65 (2). It is clear that the function of this sentence in the Connecticut sexual offense statutory scheme is the same as its function in the predecessor scheme, namely, to incorporate into those sexual assault offenses which involve sexual intercourse; General Statutes §§ 53a-70, 53a-70a and 53a-71; the common law marital exemption as a defense to prosecution, and not to require proof of marriage as an essential element of the offense.[6]

This conclusion is buttressed by reference to General Statutes § 53a-81. That statute defines the crime of adultery as "engag[ing] in sexual intercourse with any person other than [the defendant's] spouse." If the definition of sexual intercourse in General Statutes § 53a-65 (2), which is specifically applicable to § 53a-81; see General Statutes § 53a-65; requires proof of lack

---

[6] We need not decide in this case whether the other sexual offenses, which depend on the definition of "sexual contact," also incorporate the common law marital exemption as a defense or require proof of nonmarriage as an essential element. See, e.g., General Statutes § 53a-72a (sexual assault in the third degree); General Statutes § 53a-73a (sexual assault in the fourth degree). The definition of "sexual contact" means, in general, contact with intimate personal parts between the defendant and "a person not married to the [defendant] . . . . " General Statutes § 53a-65 (3). We assumed in *State* v. *Huey*, 1 Conn. App. 724, 730–32, 476 A.2d 613 (1984), aff'd on other grounds, 199 Conn. 121, 505 A.2d 1242 (1986), that this definition requires proof of nonmarriage. Our historical analysis, however, casts doubt on the propriety of that assumption.

of marriage, the language in § 53a-81, "with any person other than his spouse," would be superfluous. We do not read statutes in such a way. See *Gill* v. *Petrazzuoli Bros., Inc.,* 10 Conn. App. 22, 31, 521 A.2d 212 (1987).

Our conclusion is further buttressed by reading the entire sexual offense statutory scheme. By virtue of the definition of "sexual intercourse" in General Statutes § 53a-65 (2), the statutory scheme includes forcible homosexual as well as forcible heterosexual intercourse. It would be an absurd and bizarre requirement that the state would have to prove, and the jury would have to be instructed, that a male defendant was not married to his male victim. We do not read statutes so as to lead to such bizarre results. *Shelby Mutual Ins. Co.* v. *Della Ghelfa,* 3 Conn. App. 432, 438, 489 A.2d 398 (1985), aff'd, 200 Conn. 630, 513 A.2d 52 (1986).

In this case, the defendant did not produce any evidence invoking the marital exemption or defense. See *State* v. *Januszewski,* supra; *State* v. *Tinsley,* supra. There is no evidence in this record to suggest that the defendant and victim even knew each other, let alone that they were husband and wife. Thus, there was no occasion for their nonmarital status to enter the case in any way.

### III

The defendant's final claim is that the court erred by submitting to the jury two alternative factual bases for the larceny charge, one of which was factually insufficient. This, the defendant argues, deprived him of his constitutional rights to an adequately instructed jury, to a unanimous verdict, and to be convicted only upon proof beyond a reasonable doubt. We decline to review this claim in full because the defendant did not

preserve it, and because the record does not support it. See *State* v. *Huff,* 10 Conn. App. 330, 523 A.2d 906 (1987).

The defendant's argument derives from the fact that he was charged with larceny in the second degree in violation of General Statutes § 53a-123 (a) (3), which requires that the state prove that the property stolen was "taken from the person" of the victim. His argument is premised on the notion that, although there was evidence that the victim's *silver* ring was taken from her person, namely, off her finger, there was no evidence that her *turquoise* ring was taken from her person because that ring was attached to the key ring which she was carrying. The defendant argues that there was no evidence that the defendant took this ring from her person, as opposed to the victim having dropped it in the defendant's car or the defendant having discovered it in her jeans while she was unclothed outside the car. The defendant's argument finds little support in this record.

We reject the defendant's assertion that he sufficiently raised his claim in the trial court. The only hint that he did so is a statement made in support of his motion for a judgment of acquittal: "The larceny, taking something from a person, there is no evidence that *any* of the things that this young woman was missing were actually taken from her person." (Emphasis added.) This is a far cry from clearly and distinctly informing the trial court of the specific nature of the constitutional challenges which he seeks to mount on appeal. Indeed, if anything, the defendant's statement tended to draw the court's attention away from the bifurcated claim which he now seeks to make. The defendant took no exceptions to the court's charge to preserve this claim. *State* v. *Thurman,* 10 Conn. App. 302, 319–20, 523 A.2d 891 (1987).

We turn, therefore, to the defendant's argument that this claim of error is entitled to review under *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973). We disagree that the cases on which he relies for *Evans* review; *State* v. *Arnold,* 201 Conn. 276, 282–83, 514 A.2d 330 (1986); *State* v. *Reid,* 193 Conn. 646, 667–68 n.22, 480 A.2d 463 (1984); *State* v. *West,* 3 Conn. App. 650, 654–55, 491 A.2d 428, cert. denied, 196 Conn. 810, 494 A.2d 906 (1985); support his position. Those cases involve the question of the sufficiency of the evidence to support a general verdict of guilty on a single count of an information charging alternative *statutory methods* of committing the same crime. That question is simply not involved in this case. This information charged only one way of committing the crime of larceny in the third degree, namely, that the defendant "wrongfully took property from the person of" the victim, and the jury was not presented with any statutory alternative ways of committing this offense.

Nor does the defendant's claim fare any better under our recently clarified *Evans* analysis. See *State* v. *Huff,* supra, 333–34. Although the defendant does sufficiently attach a constitutional label to his claim; id., 334; a limited review of the record discloses that the label is attached "to what is analytically, at its core, a nonconstitutional claim." Id., 335.

The state's proof at trial was unitary. The state did not seek to differentiate between the taking of the silver ring and of the turquoise ring. Furthermore, both of them were found in the defendant's possession. Consistent with the state's unitary theory of this part of its case, the trial court twice charged the jury, without exception by either the state or the defendant, that the "property" which the state claimed to have been

stolen from the victim's person was "rings."[7] Finally, it is significant that the defendant's trial counsel, in taking her exception to the court's charge on larceny, did not seek to differentiate between the two rings. This "is a powerful signal that, because of the posture of the case, [she] did not hear the defect in the harmful manner which [she] presses on appeal . . . . " Id., 338. We therefore decline to review this claim further. Id.

There is no error.

In this opinion the other judges concurred.

---

[7] The relevant parts of the court's charge were as follows: "As far as property is concerned, the type of property which is the object of larceny, is broadly defined as meaning any money, personal property, real property, articles of value of any kind. Obviously, *rings, which is the claim of the State in this case, are property.*" "Larceny, in effect, means stealing. Now, what's larceny [in the second degree]? I read that statute to you a few minutes ago, and it refers to property that is taken from the person. In this case, the State claims that the defendant took *rings* from the possession, from the person of [the victim]." (Emphasis added.)