STATE OF CONNECTICUT *v.* BETHZAIDA PADUA
(AC 21186)

STATE OF CONNECTICUT *v.* WILFREDO CALVENTE
(AC 21187)

STATE OF CONNECTICUT *v.* MIRANDA
VIRGILIA CALVENTE
(AC 21245)

Foti, Flynn and McDonald, Js.

388

Argued February 26—officially released November 5, 2002

*Richard W. Callahan*, special public defender, for the appellant (defendant in the first case).

*Sol E. Mahoney*, special public defender, for the appellant (defendant in the second case).

*Moira L. Buckley*, deputy assistant public defender, for the appellant (defendant in the third case).

*Michele C. Lukban*, assistant state's attorney, with whom, on the brief, were *Patricia M. Froehlich*, state's attorney, *Mark A. Stabile*, supervisory assistant state's attorney, and *Vincent J. Dooley* and *Roger Caridad*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

FLYNN, J. The defendants, Bethzaida Padua, Wilfredo Calvente and Miranda Virgilia Calvente, were each convicted after a joint trial before a jury following the search and seizure by the police of marijuana and other items under authority of a warrant executed in an apartment in a Willimantic public housing project. We affirm in part, and reverse in part, the judgments of the trial court.

The defendant Padua appeals from the judgment of conviction of (1) possession of a controlled substance with the intent to sell in violation of General Statutes § 21a-277 (b), (2) possession of a controlled substance with intent to sell within 1500 feet of a public housing project in violation of General Statutes §§ 21a-277 (b) and 21a-278a (b), (3) conspiracy to sell a controlled substance in violation of General Statutes §§ 53a-48 and 21a-277 (b), (4) conspiracy to sell a controlled substance within 1500 feet of a public housing project in violation of §§ 53a-48, 21a-277 (b) and 21a-278a (b), and (5) two counts of risk of injury to a child in violation of General Statutes (Rev. to 1999) § 53-21. The defendant Padua was acquitted of possession of more than four

ounces of marijuana in violation of General Statutes §§ 53a-8 and 21a-279 (b).

The defendant Wilfredo Calvente appeals from the judgment of conviction of (1) possession of a controlled substance with intent to sell in violation of § 21a-279 (b), (2) possession of more than four ounces of marijuana in violation of § 21a-279 (b), (3) possession of a controlled substance with intent to sell within 1500 feet of a public housing project in violation of §§ 21a-277 (b) and 21a-278a (b), (4) conspiracy to sell a controlled substance in violation of §§ 53a-48 and 21a-277 (b), (5) conspiracy to sell a controlled substance within 1500 feet of a public housing project in violation of §§ 53a-48, 21a-277 (b) and 21a-278a (b), and (6) two counts of risk of injury to a child in violation of § 53-21.

The defendant Miranda Calvente appeals from the judgment of conviction of (1) possession of a controlled substance with intent to sell in violation of § 21a-277 (b), (2) possession of a controlled substance with intent to sell within 1500 feet of a public housing project in violation of §§ 21a-277 (b) and 21a-278a (b), (3) conspiracy to sell a controlled substance in violation of §§ 53a-48 and 21a-277 (b), (4) conspiracy to sell a controlled substance within 1500 feet of a public housing project in violation of §§ 53a-48, 21a-277 (b) and 21a-278a (b), and (5) two counts of risk of injury to a child in violation of § 53-21. The defendant Miranda Calvente was acquitted of possession of more than four ounces of marijuana in violation of §§ 53a-8 and 21a-279 (b).

The jury could have reasonably found the following facts. In 1999, the Willimantic police department was investigating marijuana trafficking at 171 Cameo Drive, an apartment in the Village Heights Apartments, a federally subsidized multifamily housing project. The police, with the assistance of a confidential informant, effectuated "controlled buys" of marijuana from 171 Cameo

Drive. Before each buy, the police met with the informant, searched his vehicle for money, narcotics and weapons, and provided him with prerecorded money with which to purchase the marijuana. During one of the buys, the police followed the informant to the apartment and observed him go to the door and make a purchase. The next day, the police executed a search warrant for 171 Cameo Drive. Upon entering the apartment, the police observed marijuana on the kitchen table in the process of being packaged for sale. The police also found marijuana in different locations throughout the apartment totaling 10.41 ounces and a large amount of money in the purse of the defendant Miranda Calvente. The defendants were all present in the apartment as well as the defendant Padua's two children, ages seven and three. The children were found in the kitchen where marijuana was being packaged on the table near some cereal boxes, and some marijuana was seen on the floor under the table. Both Miranda Calvente and Padua were with the children in the kitchen, and Wilfredo Calvente was apprehended as he was attempting to leave the apartment through the kitchen. Additional facts will be set forth as necessary.

I

The defendants each claim that the state failed to present sufficient evidence to support their convictions on the counts of risk of injury to a child. They claim that the state failed to present expert testimony to establish that being near marijuana can be injurious to the health of a child and failed to present sufficient evidence that the children had access to marijuana. We agree that the evidence was insufficient for the reasons that follow.

The defendants concede that this claim is unpreserved and seek review under *State* v. *Golding*, 213

Conn. 233, 239–40, 567 A.2d 823 (1989).[1] "Our Supreme Court, following the dictate of the United States Supreme Court in *Jackson* v. *Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), has held that any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of *Golding*. Accordingly, we conclude that no practical reason exists to engage in a *Golding* analysis of a sufficiency of the evidence claim and, thus, review the challenge as we do any other properly preserved claim." (Citations omitted; internal quotation marks omitted.) *State* v. *Trotter*, 69 Conn. App. 1, 4, 793 A.2d 1172, cert. denied, 260 Conn. 932, 799 A.2d 297 (2002).

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) Id., 5.

The state charged each defendant with two counts of risk of injury to a child because two children, ages seven and three, were "placed in a situation where

---

[1] We do not repeat the four prongs of *State* v. *Golding*, supra, 213 Conn. 239–40, because they are set forth therein and have been repeated in hundreds of other appellate cases. We, therefore, see no need to reiterate them.

[their] health was likely to be impaired, to wit, by allowing said [children] to be near and have access to large quantities of marijuana in violation of General Statutes [Rev. to 1999] § 53-21 (1)."[2] It is important to note here that the state chose to charge the defendants in this case not with endangering the morals of a child but with placing each child in a situation likely to endanger the health of a child, although that statute would have permitted the state to have selected either likelihood as constituting the violation. See General Statutes (Rev. to 1999) § 53-21 (1). In this case, there was no evidence presented that the children were given marijuana to smoke, or that they were given matches, lighters or other devices with which to ignite the marijuana, or that they knew how to smoke the marijuana. Rather, the state contends on appeal that the children could have eaten the marijuana that was present in the apartment. Although exposing a child, old enough to appreciate what was transpiring, to selling marijuana might be considered as endangering the morals of that child, the state chose to charge under the health aspect of the statute. Endangerment of health is, therefore, an element of the offense, and some evidence that ingesting marijuana likely would have a deleterious effect on the child is required.

It is well settled that an expert witness may testify if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue. C. Tait, Connecticut Evidence (3d Ed. 2001) § 7.5.3, p. 517. Although expert testimony is permitted in a great many instances, it is required only when the question involved

---

[2] General Statutes (Rev. to 1999) § 53-21 provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony."

goes beyond the field of ordinary knowledge and experience of judges and jurors. Id., § 7.5.4. "The trier of fact *need not close its eyes to matters of common knowledge solely because the evidence includes no expert testimony on these matters.*" (Emphasis in original; internal quotation marks omitted.) *State* v. *Green*, 62 Conn. App. 217, 253, 774 A.2d 157 (2001), aff'd, 261 Conn. 653, 804 A.2d 810 (2002).

In *State* v. *Schriver*, 207 Conn. 456, 542 A.2d 686 (1988), our Supreme Court stated that "the second part [of § 53-21 (1)], which prohibits *acts* likely to injure the health or morals of a child, was limited to protecting the bodily integrity of a child. Thus, [t]o have violated the statute . . . the defendant had to have committed acts directly perpetrated on the person of a [child] . . . . By contrast, the first part of § 53-21 prohibits the wilful creation of a *situation* likely to impair the health of a child and thus encompasses the protection of the body as well as the safety and security of the environment in which the child exists, and for which the adult is responsible. . . . The plain language of the first part of § 53-21 indicates the legislature's understanding that there is a broad class of intentional conduct that can put a child's well-being seriously at risk without any physical contact by the perpetrator. Thus, to limit the meaning of health to include only physical health under this part of the statute would undermine the larger purpose of § 53-21 to afford protection to a child from the potentially harmful wilful conduct of adults." (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Payne*, 240 Conn. 766, 774, 695 A.2d 525 (1997). Section 53-21 does not require a showing that the health of the child was impaired, but only that the conduct or the acts of the defendant were such that the health of the child was likely to be impaired. *State* v. *Apostle*, 8 Conn. App. 216, 243, 512 A.2d 947 (1986).

Health means the state of being hale, sound or whole in body, mind or well-being. *State* v. *Payne,* supra, 771.

In *State* v. *Mancinone,* 15 Conn. App. 251, 545 A.2d 1131, cert. denied, 209 Conn. 818, 551 A.2d 757 (1988), cert. denied, 489 U.S. 1017, 109 S. Ct. 1132, 103 L. Ed. 2d 194 (1989), the defendant was convicted under § 53-21 for providing alcohol and marijuana to children, which created a situation risking injury to their health and morals. "Giving teenage girls liquor and marihuana are not conceptually distinct actions. They both involve furnishing the underage victims with illegal and mind-altering substances which are harmful to their physical health and induce them to lose their self-control." Id., 277.

*Mancinone* is distinguishable, however, from the present situation. In *Mancinone,* the defendant provided marijuana to thirteen and fourteen year old girls to smoke on several occasions. The court determined that the smoking of marijuana was harmful to the girls' health. In this case, the two children, ages seven and three, were in close proximity to marijuana, but there was no evidence that they were provided with any marijuana to smoke, or that they knew how to smoke or had lighters or matches with which to smoke the marijuana, nor was there any evidence that they, in any manner, ingested the marijuana, or that the adults present permitted them to smoke or otherwise to ingest the marijuana, or that they were left unsupervised either to smoke or to eat the marijuana.

In *State* v. *Clark,* 260 Conn. 813, 801 A.2d 718 (2002), our Supreme Court determined that the effect of *smoking* marijuana on a witness' ability to perceive and to recall events is within the common knowledge of jurors. The court stated: "We recognize that, because it is an illegal substance, it may be that many jurors may have no firsthand knowledge regarding the effects of mari-

juana on one's ability to perceive and to relate events. At the same time, we cannot blink at the reality that, despite its illegality, because of its widespread use, many people know of the potential effects of marijuana, either through personal experience or through the experience of family members or friends. The ability to draw inferences about the impairing effects of marijuana, like alcohol, however, is based upon common knowledge, experience and common sense, not necessarily on personal experience. . . . The unfortunate prevalence of marijuana use, coupled with the substantial effort to educate all segments of the public regarding its dangers, underscores the reality that the likely effects of smoking five marijuana cigarettes in a short period of time before an incident are within the ken of the average juror." Id., 824–25.

Although *Clark* recognizes that the effects of *smoking* marijuana are within the common knowledge of jurors, in this case, however, we must decide a distinct issue, namely, whether the physical effects on a child of being near, having access to or possibly eating marijuana are within the common knowledge of the average juror. While we certainly do not condone a child's being put in this type of situation, we cannot conclude that the jury, without the assistance of expert testimony, could have been expected to understand or to appreciate the possible detrimental physical effects of eating marijuana or solely being in its presence.

After an exhaustive search of our case law and that of other states, we find no authority for the proposition that being in the presence of unsmoked marijuana is inherently injurious to the health of a child. Additionally, we find no authority, and the parties are unable to cite any such authority, for the proposition that the deleterious effect on a child of eating marijuana is within the common knowledge of jurors. Although it may be common knowledge that smoking marijuana

would have a hallucinogenic effect, and it may be reasonable for a jury to so conclude, there is no evidence, and this court cannot assume, that the effect of eating marijuana or merely being in its presence poses risk to the health of a child and is within that same common knowledge of a juror.

Literature in the field, which was not before the jury, tells us that "[m]arijuana is a mood-altering drug. It is made from the leaves, small stems, and flowering tops of the hemp plant, cannabis sativa. Although, cannabis contains over 400 chemicals, one substance, known as THC, is chiefly responsible for the 'high' or intoxication that the drug produces." K. Bellenir, 14 Health Reference Series: Substance Abuse Sourcebook (1996) § 28, p. 235.

Conversely, other studies, also not before the jury, tell us that the seeds and oil of the hemp plant are used, legally, throughout the world in food products. "According to [a] USDA study; [U.S. Dept. of Agriculture, 'Industrial Hemp in the United States: Status and Market Potential' 7, 15 (Jan. 2000)]; '[h]emp seeds can be used as a food ingredient or crushed for oil and meal. The seed contains 20 percent high-quality digestible protein, which can be consumed by humans. . . . The oil can be used both for human consumption and industrial applications.' . . . The USDA study identifies food products containing hemp ingredients to include roasted hulled seed, nutrition bars, tortilla chips, pretzels and beer." Brief of Petitioners at 6–8, *Hemp Industries Assns.* v. *Drug Enforcement Administration* (9th Cir. 2001) (No. 01-71662) (suit challenging new interpretive rule of Drug Enforcement Administration making it unlawful to use hemp seed and oil in products used for human consumption); see also *Kenex, Ltd.* v. *Government of the United States of America,* Notice of Arbitration under United Nations Commission on International Trade Law and North American Free Trade

Agreement (August 2, 2002) (Kenex, Ltd., "manufactures, markets and distributes non-psychoactive and completely lawful industrial hemp products, including whole hemp grain (i.e. seed), hemp grain derivatives (such as refined hemp oil, hemp nut and hemp meal), hemp fiber and certified hemp seed, throughout North America"). Although this court recognizes that there is a difference, in sequelae, between those parts of the hemp plant legally used for human consumption and the illegal part of the plant known as marijuana, we cannot assume that a jury would, through common knowledge, know the dangers, if any, associated with eating this illegal part or merely being in its presence in the same household.

Mindful of our obligation to construe the evidence in the light most favorable to sustaining the verdict, we conclude, nonetheless, because of the absence of any expert testimony on this issue, that there was insufficient evidence or facts proved from which the likely danger to a child's physical health could be established beyond a reasonable doubt.

Moreover, we have reviewed the evidence and find that it did not establish that the children were, in fact, eating the marijuana, nor did it establish that they were left alone or unattended in the presence of the marijuana. The state argues that because the defendants freely conducted a drug trafficking operation in front of their children, it is unlikely that they would have closely supervised them, and it would have been very easy for the children to possibly have ingested the marijuana. We reject this as a basis to sustain the defendants' convictions for risk of injury to the children. It may be true that there are many small common household objects and substances, such as solvents, household cleaners, medicines and drugs that a child might swallow if not supervised. We decline to hold that the presence of those items, if the children are being watched,

constitutes a risk of injury. In this case, there simply was no evidence that the children were not being watched.

Accordingly, we reverse each defendant's conviction for the crime of risk of injury to a child in violation of § 53-21 and remand the cases to the trial court with direction to render judgments of acquittal on those counts.

## II

The defendant Miranda Calvente[3] claims that the court failed to instruct the jury properly on counts four and five, conspiracy to sell a controlled substance and conspiracy to sell a controlled substance within 1500 feet of a public housing project. We conclude that the court's instruction on count four was proper, but we agree with the defendant that the court's instruction on count five was improper.

The defendant did not object to the court's instruction at trial and now seeks *Golding* review. We will review the claim because the record is adequate for review and the claim that the jury was not instructed on an essential element of an offense is of constitutional magnitude. See *State* v. *Denby*, 235 Conn. 477, 483–84, 668 A.2d 682 (1995).

## A

The defendant first claims that the court failed to instruct the jury on the sale of a controlled substance, the underlying offense about which the defendants were said to have conspired in counts four and five. We are not persuaded.

"We begin by noting that an improper jury instruction as to an essential element of the crime charged may result in the violation of the defendant's due process

---

[3] We refer in this part of the opinion, part II, to Miranda Calvente as the defendant.

right to a fair trial, and thus require the reversal of a conviction based upon that instruction. . . . When reviewing the challenged jury instruction, however, we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . [I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled." (Citation omitted; internal quotation marks omitted.) *State v. Smith*, 70 Conn. App. 393, 398, 797 A.2d 1190, cert. denied, 261 Conn. 924, 806 A.2d 1063 (2002).

Because we must consider the jury charge as a whole, we review the entire charge to determine whether it was reasonably possible that the jury was misled. Before instructing the jury on the elements of each offense, the court stated: "With respect to my instructions, you are not to single out any sentence or any individual point or any specific statement and ignore the others. You are to consider all the instructions as a whole and regard each in light of all of the others. The order in which the instructions are given has no significance as to their relative importance." The court proceeded to instruct the jury thoroughly on the elements of count one, possession of a controlled substance with intent to sell, and count three, possession of a controlled substance with intent to sell within 1500 feet of a public housing project. While instructing the jury on the first count, the court stated: "The next element is that each

defendant intended to sell the marijuana. You should consider all of the surrounding circumstances in determining whether the defendants possessed the illegal substance with the intent to sell. Remember, the state is required to establish the existence of an intent to sell beyond a reasonable doubt as to each defendant. 'Sale' is any form of delivery, which includes barter, exchange or gift, or offer thereof, and each such transaction made by any person, whether as principal, proprietor, agent, servant or employee."

When the court gave its instruction on count three, it did not repeat the instructions that were identical to count one. The court stated: "The elements of this offense are the same as in count one with the added requirement that the sale or intent to sell marijuana occurred in a public housing project. For you to find any defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt: (1) that the defendant knowingly possessed with intent to sell or dispense to another person; (2) a controlled substance; (3) that the event occurred in a public housing project. You can see the elements—counts one— elements one and two are the same as they were in the first count. Apply the same rules."

When the court gave its instruction on counts four and five, conspiracy to sell a controlled substance and conspiracy to sell a controlled substance within 1500 feet of a public housing project, respectively, it did not repeat the instruction it already had given on the sale of a controlled substance with respect to count one. For counts four and five, the court gave a thorough instruction on the elements of a conspiracy and then stated: "Keep in mind that you will have to evaluate the elements of each crime as they relate to each defendant separately. As part of your deliberations, you should examine the documents known as the 'information.' There is an information for each defendant, and the

information contains specific charges as to each defendant. I've also prepared a worksheet for you, which will help you."

When we view the jury instruction as a whole, it is clear that the court gave a thorough instruction on the sale of a controlled substance in count one, but for economy did not repeat the same instruction relative to other charged crimes. The court repeatedly referred back to its earlier instruction and admonished the jury to evaluate all the elements of each crime in the information. Because the jury was fully instructed on the sale of a controlled substance in count one, we conclude that it is not reasonably possible that the jury was misled by not being repeatedly instructed on that same element in counts four and five. Accordingly, we conclude that the defendant cannot prevail on this specific claim under the third prong of *Golding* because she has not established that a constitutional violation clearly exists that clearly deprived her of a fair trial.

B

The defendant next claims that the court improperly instructed the jury on count five, conspiracy to sell a controlled substance within 1500 feet of a public housing project. She claims that the court improperly instructed the jury that to find her guilty, the jury needed to find that the *conspiracy occurred within 1500 feet of the housing project*, rather than finding that the object of the conspiracy was to *sell the marijuana within 1500 feet of the housing project*. We agree.

In its instruction on count five, conspiracy to sell a controlled substance within 1500 feet of a public housing project, the court stated: "The elements of the crime are identical to those in count four with the added element that the state must prove beyond a reasonable doubt that *the conspiracy occurred within 1500 feet of a public housing project*. Please carefully review all

of the elements necessary to establish a conspiracy as set forth in count four." (Emphasis added.)

In its instruction, the court failed to set out the elements of the underlying offense and failed to provide the jury guidance as to where the sale had to take place. The evil our statutes address is the *sale* of cannabis, controlled drugs or narcotics within 1500 feet of a public housing project. The law is not concerned with where the plan was hatched, but with where the conspirators proposed to carry out its unlawful purpose. The enhanced penalties relate to sales made within such a perimeter of a public housing project because of the special harm that can result to parts of our population living within such a close concentration of people.

During discussion of this prohibition in the House of Representatives, Representative Douglas C. Mintz stated: "What this bill does is add public housing projects to the drug free zones that we created a few years ago for our schools. The sentence would be a three-year mandatory add-on for anyone who *sells* drugs within [1500] feet of a housing project." (Emphasis added.) 36 H.R. Proc., Pt. 5, 1992 Sess., p. 1576. Consequently, the special wrong sought to be remedied related to the sale of the contraband within 1500 feet of a public housing project, not to where the agreement was made to carry on such sales. In fact, the court specified that the conspiracy, not the agreed upon sale, had to occur within 1500 feet of the public housing project. "Unless there is a clear indication to the contrary, a jury is presumed to follow the court's instructions." (Internal quotation marks omitted.) *State* v. *Coughlin*, 61 Conn. App. 90, 96, 762 A.2d 1 (2000), cert. denied, 255 Conn. 934, 767 A.2d 105 (2001).

On the basis of our review of the record, we conclude that it is reasonably possible that the jury was misled by the court's instruction and, therefore, the defendant

has satisfied the third prong of *Golding*. See *State* v. *Tate*, 59 Conn. App. 282, 286, 755 A.2d 984, cert. denied, 254 Conn. 935, 761 A.2d 757 (2000). Accordingly, we reverse the judgment of conviction on count five, which alleged conspiracy to sell a controlled substance within 1500 feet of a public housing project, and remand the case to the trial court for a new trial on that count. Although the defendants Wilfredo Calvente and Padua did not raise, in their respective appeals, the claim of instructional error in the court's charging that the conspiracy, rather than the sale, must occur within 1500 feet of a public housing project, their convictions for violation of §§ 53a-48, 21a-277 (b) and 21a-278a (b) are reversed as well, and a new trial is ordered for each of them on that charge.[4]

### III

We next turn to the defendants' double jeopardy claims arising out of their convictions of two counts each of conspiracy to sell a controlled substance. Although we reverse the defendants' convictions on the charge of conspiracy to sell a controlled substance within 1500 feet of a public housing project in count five, we address this claim because it is likely to arise in the new trial in the event that the jury again convicts the defendants of that crime.

Each of the defendants was convicted of (1) conspiracy to sell a controlled substance and (2) conspiracy to sell a controlled substance within 1500 feet of a public housing project. Each of the defendants claims on appeal that the information in their respective cases indicates that the same location, date, parties and acts

---

[4] See *Gino's Pizza of East Hartford, Inc.* v. *Kaplan*, 193 Conn. 135, 141–42, 475 A.2d 305 (1984) (when rights of parties are sufficiently interwoven, party who fails to appeal from judgment may, nonetheless, benefit from appellate decision rendered in context of appeal brought by another party in same case).

constituted the underlying facts of each offense. The defendants allege a violation of the double jeopardy provision of the fifth amendment to the United States constitution, which provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb . . . ." The defendants claim that the violation of that clause clearly exists because the double jeopardy clause prohibits multiple punishments for the same offense. See *State* v. *Ketchum*, 45 Conn. App. 270, 277, 696 A.2d 987, cert. denied, 242 Conn. 910, 697 A.2d 368 (1997). They contend that the multiple punishment effectively denied each defendant a fair trial and is not subject to harmless error analysis.

The state concedes that each defendant's conviction of two counts of conspiracy resulting in two sentences arose out of the same agreement and violated their respective rights under the double jeopardy clause. The defendants and the state disagree, however, about what the remedy should be for this violation of their constitutional rights.[5] The state sought to have us order a remand with direction to combine the conspiracy convictions and to vacate the sentence on the lesser crime of conspiracy to sell marijuana. We agree with the state.

In *State* v. *Howard*, 221 Conn. 447, 604 A.2d 1294 (1992), our Supreme Court determined that the appro-

---

[5] In fact, the defendants disagreed among themselves as to what the appropriate remedy should be. The defendant Wilfredo Calvente claimed that his "convictions for two counts of conspiracy must be vacated, as only one conviction may stand." The defendant Bethzaida Padua claimed that this court should reverse the judgment and remand her case to the trial court with direction to vacate her conviction on the count of conspiracy to sell a controlled substance. The defendant Miranda Calvente claimed that this court should set aside the judgment of conviction on one of the conspiracy counts and order the count merged as required by *State* v. *Chicano*, 216 Conn. 699, 703, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991). Miranda Calvente further claimed that this court should vacate her sentence for conspiracy to sell a controlled substance within 1500 feet of a public housing project.

priate order of remand, where the court's intention is clear, is to combine the two conspiracy convictions and to vacate the sentence for one of them. The court reasoned that it favored that kind of rescript because if the remaining conviction were later invalidated on collateral attack for a reason not affecting the merged conviction, that unaffected conviction would be resuscitated and the defendant punished for it. Id., 463.

We agree with the state's contention that under *State* v. *Chicano*, 216 Conn. 699, 712, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991), "the relevant factors bearing upon the decision of which conviction to negate when two convictions cannot both stand are the same regardless of whether one of the offenses is a lesser included offense of the other." Our decision is controlled by *State* v. *Howard*, supra, 221 Conn. 462–63, involving two conspiracy convictions and adopting *Chicano* as the standard for determining which sentence should control. The governing standard is dependent upon whether the sentencing court's intention as to which of its sentences should control is clear. In the event the defendants are again tried and convicted of conspiracy to sell a controlled substance within 1500 feet of a public housing project, we direct the court to combine the conspiracy convictions, to vacate the sentence for the lesser offense of conspiracy to sell a controlled substance in violation of §§ 53a-48 and 21a-277 (b), and to sentence the defendants only for conspiring to commit the offense within 1500 feet of a public housing project.

IV

We next address the claim raised by all of the defendants that the state failed to present sufficient evidence that the Village Heights Apartments complex is a public housing project. They maintain that there was insufficient evidence of what constitutes a public housing

project for the jury to find that the defendants sold a controlled substance within 1500 feet of a housing project.

This claim was not preserved. The defendants contend that it is reviewable on appeal under *Golding* and controlled by *State* v. *Aleksiewicz*, 20 Conn. App. 643, 646, 569 A.2d 567 (1990), *State* v. *Estrada*, 26 Conn. App. 641, 653, 603 A.2d 1179, cert. denied, 221 Conn. 923, 608 A.2d 688 (1992), and *State* v. *Delafose*, 185 Conn. 517, 441 A.2d 158 (1981). As we stated in part I, unpreserved sufficiency claims qualify for *Golding* review. See *State* v. *Morgan*, 70 Conn. App. 255, 281, 797 A.2d 616, cert. denied, 261 Conn. 919, 806 A.2d 1056 (2002). For reasons we will later amplify, although we conclude that the record is adequate for review, we conclude that the claimed constitutional violation does not clearly exist.

*Aleksiewicz* is inapposite to this case. In *Aleksiewicz*, there was no evidence of an essential element of the crime charged, namely, use or threatened use of a gun. *State* v. *Aleksiewicz*, supra, 20 Conn. App. 650. *Estrada* too is inapposite because in it we reviewed a sufficiency of the evidence claim concerning when an injury was serious, but there was no claim that the court should have read the exact words of a statutory definition or read a statutory definition of each phrase that was part of the general definition. *State* v. *Estrada*, supra, 26 Conn. App. 653–56. We do not find *Delafose* pertinent either. Unlike the present case, in *Delafose* there was *no* evidence of an essential element of the crime. *State* v. *Delafose*, supra, 185 Conn. 526.

"In reviewing [the] sufficiency of the evidence claim [under *Golding*], we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reason-

ably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Lewis*, 67 Conn. App. 643, 646, 789 A.2d 519 (2002).

Section 21a-278a (b) proscribes, inter alia, possession with intent to sell a controlled substance within 1500 feet of a public housing project. This statute further specifies: "For the purposes of this subsection, 'public housing project' means dwelling accommodations operated as a state or federally subsidized multifamily housing project by a housing authority, nonprofit corporation or municipal developer, as defined in section 8-39, pursuant to chapter 128 or by the Connecticut Housing Authority pursuant to chapter 129."

To prove the defendant guilty of these counts, the state was required to prove that a public housing project existed within 1500 feet of the intended sale. See *State* v. *Denby*, supra, 235 Conn. 483.

The defendants contend that the state needed to establish that the Village Heights Apartments, which contained the apartment in which all of the defendants had been located, was a state or federally subsidized multifamily housing project and that the housing project was run by a nonprofit corporation as defined in General Statutes § 8-39 (w), which is further defined in chapter 602, General Statutes § 33-1002 (8) and (21). Section 33-1002 (8) provides: " 'Corporation' or 'domestic corporation' means a corporation without capital stock or shares, which is not a foreign corporation, incorporated under the laws of this state, whether general law or special act and whether before or after January 1, 1997, but shall not include towns, cities, boroughs or any municipal corporation or department thereof." General Statutes § 33-1002 (21) provides: "A

corporation is 'nonprofit' if no distribution may be made to its members, directors or officers."

The state maintains that the evidence was sufficient because the jury could have concluded that the apartment was located in a public housing project because Nicole Labruna, the property manager, and Clifford Spinner, a Willimantic police officer, both testified that the complex comprising the Village Heights Apartments was a public housing project. Alternatively, the state argues that the term public housing project has a commonly understood meaning in that the American Heritage Dictionary (2d Ed. 1982) defines housing as residences or dwelling houses for people, and, analyzing from a definition of public library, that the same dictionary defines "public" in this context to mean "supported by public funds."

The state argues that evidence that the project is a complex of buildings of seven or eight apartments each, where tenants' rent is based on their income, and operated under a federal subsidy by a nonprofit corporation sufficed to establish that the Village Heights Apartments complex was a public housing project. We agree.

In *State* v. *Scott*, 11 Conn. App. 102, 110–11, 525 A.2d 1364, cert. denied, 204 Conn. 811, 528 A.2d 1157 (1987), the defendant was convicted of sexual assault in the first degree and claimed on appeal that the state's proof was insufficient because it did not establish beyond a reasonable doubt that he and the victim were not married. Then Associate Judge David M. Borden, writing for the court, concluded that the absence of a marital relationship was not an essential element of the crime, and, therefore, the trial court did not improperly omit from its charge to the jury, and the state was not required to establish as part of its case-in-chief, the lack of a marital status. Id., 111. We find the reasoning in *Scott* persuasive. The court stated that "[t]he state bears

the burden of proving all essential elements beyond a reasonable doubt," but "[w]hether the existence of some fact is an essential element of a crime depends upon whether the existence of that fact forms a part of the conduct prohibited by the statute; that is, whether the fact in question is part of the corpus delicti." (Internal quotation marks omitted.) Id., 111–12. In this case, the element in issue that the state had to prove was that the criminal activity took place in a public housing project. The defendants never raised any claim of exemption or defense by virtue of improper distributions from the nonprofit corporation or its failure to maintain valid Connecticut incorporation. The state was not required to prove further in its case-in-chief that no part of the income or profits had been paid to the members of it or that the entity operating it was incorporated in Connecticut without capital stock.

We note that as to the definition of a public housing project, the court charged the jury in pertinent part as follows: "You can see the elements—counts one— elements one and two are the same as they were in the first count. Apply the same rules. The third element is that the event occurred in a public housing project. A 'public housing project' means dwelling accommodations operated as a state or federally subsidized multifamily housing project by a housing authority, nonprofit corporation or municipal developer. Again, you may recall the testimony of Nicole Labruna, who identified herself as the manager of the apartment complex in Willimantic known as Village Heights Apartments, and testified that the apartment of Bethzaida Padua was in a public housing project or words to that effect. It is for you to determine her credibility and whether that fact has been proven beyond a reasonable doubt."

The defendants took no exception to that part of the charge, nor did they request that the court add to its instruction the definition of a public housing project

found in § 8-39 or a further instruction on the statutory definitions of a nonprofit corporation found in § 8-39 (w) and (x).

Confronted with a claim of improper instruction arising out of a crime that involved the use of a dangerous instrument in *State* v. *Huff*, 10 Conn. App. 330, 335, 523 A.2d 906, cert. denied, 203 Conn. 809, 525 A.2d 523 (1987), we stated: "The court read the jury the statutory definition of the essential element of the crime charged, namely use of a 'dangerous instrument.' 'Serious physical injury,' is not itself, however, an essential element of the crime charged. It is but a definitional component of an essential element. A court's failure to read the statutory definition of a phrase which itself appears as part of the definition of an essential element, is not an error of constitutional proportion. The court's obligation to charge on the essential elements of the crime charged 'does not transform every deviation from the particular statutory definition chosen by the legislature into a constitutional error.' . . . The defendant has attached a constitutional label to what is analytically, at its core, a nonconstitutional claim. . . . We therefore decline to review this claim further." (Citations omitted.)

We note that there was no cross-examination of Labruna[6] on the issue of whether the Village Heights

---

[6] During direct examination of Labruna by the state, the following colloquy occurred:

"Q. So, tell us again what it is you do for a living?

"A. I manage an apartment complex, Village Heights Apartments.

"Q. Where is that located?

"A. Willimantic, Connecticut.

"Q. And is the company for which you work, which manages that apartment complex, a nonprofit corporation?

"A. Yes.

"Q. And is Village Heights Apartments operated as a federally subsidized multifamily housing project?

"A. Yes.

"Q. So, it's what we would typically call in the vernacular, public housing?

"A. Yes.

Apartments complex was a housing project, even though each defendant was permitted full right to examine the witness.

We hold that this situation is analogous to *Huff* in that the state's proof is not constitutionally insufficient for lack of direct evidence. Accordingly, the defendant's claim fails under the third prong of *Golding*.

V

We next address a claim made only by the defendant Miranda Calvente[7] that she was deprived of her right to confront and cross-examine a witness in violation of the sixth amendment to the United States constitution by the state's failure to call a confidential informant to the witness stand, and that she was deprived of her right to a fair trial under the fourteenth amendment to the United States constitution and the holding of *Roviaro* v. *United States*, 353 U.S. 53, 77 S. Ct. 623, 1 L. Ed. 2d 639 (1957), by the state's failure to reveal the identity of a confidential informant.

At trial, the state did not call as a witness the confidential informant who made two purchases of marijuana at the Cameo Drive apartment and unsuccessfully attempted a third. Instead, the state called Lieutenant Clifford Spinner, a member of the Willimantic police department, to testify about his observations of the confidential informant's activities with respect to the two purchases and the attempt to purchase marijuana at the Cameo Drive apartment. The defendant contends that the state "refused to disclose the identity of the

"Q. Does that property include a dwelling which is known as 171 Cameo Drive, Willimantic?

"A. Yes.

"Q. And in March of 1999, who had leased that apartment?

"A. The lessee was Bethzaida Padua."

[7] We refer in parts V, VI, VII and VIII of this opinion to Miranda Calvente as the defendant.

confidential informant." There is nothing in the record to indicate that she ever requested an order from the court to the state to disclose the identity of the informant. Instead, Wilfredo Calvente filed a motion in limine, addressed only to caution the state's witnesses not to use the term confidential informant while testifying. The court granted that motion and ordered that the informant be referred to only as "a person." The state maintains that the claim is unpreserved, unreviewable, and, even if reviewed, meritless. We agree.

None of the defendants sought to have the court order the disclosure of the informant's identity. The *Roviaro* case employs a two part test to determine whether the identity of a confidential informant need be disclosed. Id., 60–61. Both parts require the court to engage in a balancing of (1) the preservation of the underlying purpose of the confidentiality, which is to protect persons from retaliation after they give information about criminal activity to the police, and (2) fundamental requirements of fairness. Id. Had the issue been raised properly by motion, the trial court could have been alerted to what this defendant has raised for the first time on appeal. The state would have been on notice of the need to make a record as to *Roviaro*'s first prong and to make a record that it was asserting the "informant's privilege" and of the reasons why the informant's safety might have been jeopardized by disclosure. See *State* v. *Jackson*, 239 Conn. 629, 634, 687 A.2d 485 (1997). If in fact the trial court acted upon a motion presented to it, it could have articulated the reasons why it so denied the relief sought. We agree with the state that there is no adequate record for review nor is there a basis for determining that there was an abuse of a discretion which the court was never called upon to exercise.[8]

---

[8] The defendant Miranda Calvente did raise an argument about the right of confrontation during Wilfredo Calvente's hearing in limine about whether the state's informant as to earlier purchases made by him could be referred

## VI

The defendant Miranda Calvente next claims that the
state presented insufficient evidence that she was an

to by other state's witnesses using the term "confidential informant."

The following exchanges are pertinent:

"[Counsel for Wilfredo Calvente]: And the third motion in limine is to
caution any of the state's witnesses who have knowledge of—to avoid the
reference, direct or indirect, in the presence of the jury of any confidential
informants or statements of any confidential informants since we have been
told that there's a confidential informant. We requested the name of the
confidential informant. The state has chosen not to disclose the name of
the confidential informant, so we have at this point no way of testing the
confidential informant's reliability and assuring due process to our clients.

"[Prosecutor]: Your Honor, a confidential informant was used in this
investigation and the—I will present testimony describing controlled buys
made from the target dwelling. The police officers will testify as to how the
controlled buys took place, and they will indicate that the confidential
informant who was used to undertake those buys was under the constant
surveillance and was searched before and after the buy was undertaken.
The credibility of that informant, therefore, will not be an issue, and I do
not intend to offer any out-of-court statements by that informant through
the police officers.

\* \* \*

"The Court: [To defense counsel] What do you find objectionable about
it . . . ?

"[Defense Counsel]: The term 'confidential informant,' Your Honor.

"The Court: So, if another term was used that would obviate your
objection?

"[Defense Counsel]: Depending on the term, it may very well obviate the
objection, Your Honor.

"The Court: [Counsel for the defendant Miranda Calvente] rises.

"[Counsel for the defendant Miranda Calvente]: I have to object to this
type of procedure. What I think we're doing is we're placing confidence in
the person who went to this apartment and allegedly made a buy. Although
the police officer will testify that he saw the person at all times, if the person
stepped in or had any conversation with any of the clients, that may affect
what happened at that time. We're going to discuss a scene in which—let's
say that they didn't want to disclose the names of the police officers. They
just want to tell you this happened. That seems to be unfair. There's no
way for the clients now to say I wasn't there. I don't know who that person
is. Did that person ever come to the door? Was I in the apartment? How
do I know what happened? They don't describe the scene so that we can
respond to it. They only describe it from a distance, from what the police
did. It's unfair as to each one of these defendants. Was my client in the
apartment? Did she ever see that person come to the door? Does she know

accessory to possession of marijuana with intent to sell, in violation of General Statutes §§ 53a-8 and 21a-277 (b) and the more serious offense of possession of marijuana with the intent to sell within 1500 feet of a public housing project, as an accessory, in violation of §§ 53a-8, 21a-277 (b) and 21a-278a (b).[9] We do not agree.

At the outset, we reiterate our well settled standard of review. "In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . The question on appeal is not whether we believe that the evidence established guilt beyond a reasonable doubt, but rather whether, after viewing the evidence in the light most favorable to sustaining the judgment, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . While the jury may not speculate to reach a conclusion of guilt, [it] may draw reasonable, logical inferences from the facts proven to reach a verdict. . . . Deference is given to the trier of fact who had the opportunity to observe the conduct, demeanor and attitude of the trial witnesses and to assess their credibility." (Internal quota-

what happened when that person come to the door? What can she respond to when we don't know who the person is?

\* \* \*

"The Court: Insofar as [counsel for the defendant Wilfredo Calvente] has filed a motion in limine, the court will grant the motion and direct that the state not use the term 'confidential informant' but may use the term 'person.' "

[9] The defendant Miranda Calvente also claims that the state presented insufficient evidence that she conspired to sell a controlled substance within 1500 feet of a public housing project. Because we reverse the defendants' convictions on that count, we do not address that claim.

tion marks omitted.) *State* v. *Riser*, 70 Conn. App. 543, 551, 800 A.2d 564 (2002).

The gravamen of the defendant's first claim is that there was insufficient evidence of possession because there was no evidence that the defendant solicited, requested, commanded, importuned or intentionally aided anyone in the possession of marijuana or the possession of it with intent to sell. Section 53a-8, governing accessorial liability, requires proof of at least one of those acts to make one criminally liable for the acts of another. To be guilty as an accessory, one must share the criminal intent and community of unlawful purpose with the perpetrator of the crime, and one must knowingly and wilfully assist the perpetrator in the acts which prepare for, facilitate or consummate it. *State* v. *Robertson*, 254 Conn. 739, 783, 760 A.2d 82 (2000). This has sometimes been described as a dual intent. The person charged with accessorial liability must intend both to commit the underlying crime and to assist in the acts that prepare for, facilitate or consummate it. We, therefore, first examine the evidentiary record, in the light most favorable to sustaining the verdict, to determine whether there is sufficient evidence from which the jury could have inferred both that the defendant Miranda Calvente intended both to possess marijuana with intent to sell it and to assist other defendants in acts preparatory to, or in consummation of, that crime.

The defendant first urges us that: "[t]he jury's acquittal of the defendant Miranda Virgilia Calvente on count two, possession of *more than* for ounces of marijuana as an accessory, in and of itself indicates that the state had insufficient evidence of [possession with intent to sell and possession within 1500 feet of a public housing project]," citing *State* v. *Amaral*, 179 Conn. 239, 243, 425 A.2d 1293 (1979), and *State* v. *Williams*, 12 Conn. App. 225, 530 A.2d 627 (1987). We do not agree. We

look to the information and determine whether it is possible to have committed the two offenses about which the defendant makes this claim without first having committed the offense for which the jury acquitted her. *State* v. *Amaral*, supra, 243.

We conclude that it was not necessary for the jury to find that the defendant possessed more than four ounces of marijuana, as charged in count two, for her to be convicted of possession with intent to sell marijuana and possession with intent to sell it within 1500 feet of a public housing project, as charged in counts one and three, respectively, because there was additional evidence beyond the weight of the contraband which pointed toward her guilt as charged in counts one and three.

We first observe that the information charging the defendant under § 53a-8 in both the first count and third count describes *her* as the principal, not the accessory, when it states that "on or about March 12, 1999, in the city of Willimantic, the said MIRANDA VIRGILIA CALVENTE, aided by other persons, to wit Jose Calvente, Benjamin Calvente, Wilfredo Calvente and Bethzaida Padua, did possess a controlled substance, to wit marijuana, with the intent to sell or dispense the same in violation of General Statutes, Sections 53a-8 and 21a-277 (b)." It does not state that she aided anyone, but instead accuses her of committing the crime, aided by others. When we examine count two of the information, which charges that she possessed more than four ounces of marijuana, we find that although it, too, invokes the accessory statute, § 53a-8, its narrative nonetheless also describes her as a principal, not an accessory, who was aided in her possession by others. It reads: "on or about March 12, 1999, in the city of Willimantic, the said MIRANDA VIRGILIA CALVENTE, aided by other persons, to wit Jose Calvente, Benjamin Calvente, Wilfredo Calvente and Bethzaida Padua, did

possess more than four ounces of a controlled substance, to wit marijuana, in violation of General Statutes, Sections 53a-8 and 21a-279 (b)."

In the court's charge as to counts one and two, it instructed the jury that the defendants were charged as principals or accessories. The court did not expressly say that the defendants are charged "as principals or accessories" with respect to count three but did tell the jury that "the defendants are charged with violating [General Statutes §] 21a-278a (b)" and that the elements of this offense are the same as in count one, with the added requirement that the sale or intent to sell marijuana occurred in a public housing project.

We therefore conclude that the defendant was charged as a principal in count one and, therefore, that it was not necessary for the jury to find that she aided others by solicitation, request, command, importunation or intentional aid under the accessory statute, § 53a-8, because the information describes her as a principal aided by others, and the jury was instructed that she, along with the other defendants, was charged as an accessory or principal, giving notice of her potential criminal liability under the charges as either a principal or an accessory.

On appeal, the defendant makes no claim of prejudice because of the variance between the information and the court's charge. "This state . . . long ago adopted the rule that there is no practical significance in being labeled an *accessory* or a *principal* for the purpose of determining criminal responsibility. . . . Under the modern approach, a person is legally accountable for the conduct of another when he is an accomplice of the other person in the commission of the crime. . . . [T]here is no such crime as being an accessory. . . . The accessory statute merely provides alternate means by which a substantive crime may be committed." (Cita-

tions omitted; emphasis added; internal quotation marks omitted.) *State* v. *Correa*, 241 Conn. 322, 340–41, 696 A.2d 944 (1997).

There was evidence before the jury that the leafy substance on the kitchen table was, in fact, marijuana. This testimony was offered by Silva Terdjanian, a chemist for the department of public safety. There was also evidence from which the jury could infer that the defendant had knowledge both of the presence of marijuana on the table and that the substance on the table was marijuana. The defendant was present in the apartment at the time of the search and seizure. While mere presence is not enough to support an inference of dominion or control, where there are other pieces of evidence tying the defendant to dominion and control, the jury was entitled to consider the fact of her presence and to draw inferences from that presence and the other circumstances linking her to the crime. See *State* v. *Jefferson*, 67 Conn. App. 249, 257, 786 A.2d 1189 (2001), cert. denied, 259 Conn. 918, 791 A.2d 566 (2002). The substance was found in plain view, and the jury could infer from the fact that the $2500 taken from the defendant's purse contained marked money from a known cannabis sale made earlier that day that she was a financial partner in the ownership and possession of marijuana and in the plan to possess marijuana with intent to sell.

While she did not have the marijuana on her person so as to constitute actual possession, there was evidence from which the jury could infer her concurrent exercise of dominion or control over it by virtue of its being in the process of being packaged for sale in the kitchen in which she was present, and her possession of a substantial amount of cash, folded in a manner consistent with drug sales, which contained one marked $10 bill from a prior sale of marijuana. These facts would also support an inference that she had the neces-

sary specific intent to possess the marijuana with the intent to sell it. The defendant's repeated deposit to bank accounts of sizable sums of money in the past, her possession of segregated bills folded and organized in a manner consistent with retail marijuana sales, which included the recorded police buy money, and her presence at the place where the marijuana was being sold all point to her role as one "laundering" or funneling the monies into a bank account where it could be used to continue the marijuana selling and be safely distributed to those engaged in drug sales. "Illegal sales of controlled substances generate billions of dollars in revenue every year. Narcotics traffickers continually seek to make their illegal income appear legitimate. When [traffickers] attempt to move their profits beyond the reach of law enforcement authorities, their monies are frequently funneled through financial institutions in the United States." *United States* v. *Daccarett*, 6 F.3d 37, 43 (2d Cir. 1993), cert. denied sub nom. *Creaciones Viviana Ltda.* v. *United States*, 510 U.S. 1191, 114 S. Ct. 1294, 127 L. Ed. 2d 648 (1994).

From these facts, taken together with the evidence of her presence in the apartment, the evidence of her comings and goings, and the testimony of the manager of the housing complex that the apartment was in a public housing project, there was sufficient evidence to warrant the jury's inference that the defendant knew that she was within 1500 feet of a housing project when she possessed the marijuana with intent to sell, and, thus, there was sufficient evidence of her guilt with respect to both counts one and three.

## VII

The defendant Miranda Calvente claims that the jury's verdict on counts one, two and three of the information was legally inconsistent, and the court's acceptance of the guilty verdict violated her due process rights under

the fourteenth amendment to the United States constitution and article first, § 8, of the constitution of Connecticut.[10] Specifically, she claims that, because the jury acquitted her being an accessory to possession of more than four ounces of marijuana, the state failed to prove the essential element of possession. Furthermore, she contends that if the state failed to prove that she possessed the marijuana, then the jury could not have convicted her being an accessory to possession of a controlled substance with intent to sell and being an accessory to possession of a controlled substance with intent to sell within 1500 feet of a public housing project. We are not persuaded.

The defendant concedes that this claim is unpreserved and now seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40. We will review the defendant's claim because the record is adequate for review, and the claim of a legal inconsistency in the verdict is of constitutional magnitude. See *State* v. *Hinton*, 227 Conn. 301, 313–14, 630 A.2d 593 (1993). We conclude, however, that the defendant cannot prevail under the third prong of *Golding* because she has not established that a constitutional violation clearly exists that clearly deprived her of a fair trial.

In this case, the jury's verdict was not inconsistent. "The issue of legal inconsistency typically arises when a defendant is convicted of two offenses that contain contradictory elements. Such verdicts are legally inconsistent if the existence of the essential elements for one offense negates the existence of the essential elements for another offense of which the defendant also stands convicted. . . . [T]he defendant was convicted of one

---

[10] Count one of the information charged Miranda Calvente with possession of a controlled substance with intent to sell, count two charged her with possession of more than four ounces of marijuana and count three charged her with possession of a controlled substance with intent to sell within 1500 feet of a public housing project. She was acquitted on count two.

offense and acquitted of the other. [Because the court is] not dealing with a situation in which the defendant is convicted of two offenses, and one conviction negates the other, the verdicts are not legally inconsistent in the usual sense. . . . [W]here the inconsistent verdicts claim involves a simultaneous conviction and acquittal on different offenses, the court, in testing the verdict of guilty for inconsistency as a matter of law, is necessarily limited to an examination of the offense charged in the information and the verdict rendered thereon without regard to what evidence the jury had for consideration. . . . If the offenses charged contain different elements, then a conviction of one offense is not inconsistent on its face with an acquittal of the other." (Citations omitted; internal quotation marks omitted.) *State* v. *DeCaro*, 252 Conn. 229, 244, 745 A.2d 800 (2000).

The defendant is correct in her assertion that counts one, two and three of the information all contain the essential element of possession. However, the offenses contain other separate elements as well. The jury reasonably could have found that the state proved that the defendant possessed the marijuana but failed to prove that it was more than four ounces and, thus, acquitted her on count two, which required that the quantity exceed four ounces. Because each offense contained different elements, a conviction of one offense is not inconsistent on its face with an acquittal of the other. See id., 245.

The defendant further claims that the verdict also is inconsistent when the information is viewed as a whole. Specifically, she isolates the conspiracy counts against her, which specify that "one or more . . . parties did possess a large quantity of marijuana, to wit, approximately 13 ounces of marijuana . . . ." She claims that because the conspiracy counts specified thirteen ounces of marijuana, it was inconsistent to find her guilty on those charges while acquitting her of posses-

sion of more than four ounces of marijuana. In the information, the state charged the defendant with conspiracy to sell a controlled substance and conspiracy to sell a controlled substance within 1500 feet of a public housing project. In both of the those counts, the state set out three overt acts in support of the conspiracy counts, including the possession of approximately thirteen ounces of marijuana.[11] The information stated, however, that the defendants "did commit *one or more* of the following overt acts . . . ." (Emphasis added.) The state, therefore, was not required to prove each and every one of the overt acts alleged in the information. The jury reasonably could have found that the state did not prove that the defendants possessed thirteen ounces of marijuana but that it did prove one or more of the other overt acts alleged.

On the basis of our review of the information and the verdict rendered thereon, we conclude that the verdict was not inconsistent as a matter of law.

### VIII

Finally, the defendant Miranda Calvente claims that the court improperly admitted into evidence the oral and written statements of the her husband. We are not persuaded.

Following the defendant's arrest, her husband, Jose Calvente, went to the Willimantic police department. He told an officer that the money seized from his wife belonged to him, but he was unable to tell the officer how much money was in the purse. He returned to the

---

[11] The three overt acts alleged in the information were: "1. That one or more of said parties did conduct sales of marijuana from the residence of Wilfredo Calvente at 171 Cameo Drive, Willimantic, CT. 2. That one or more of said parties did possess a large quantity of marijuana, to wit approximately 13 ounces of marijuana within said residence. 3. That one or more of said parties did separate and package said marijuana for purposes of resale within said residence."

police station the next day and told an officer that the $2500 in the defendant's purse was his. The defendant's husband also signed a written statement to that effect.

At trial, during the state's direct examination of Detective Stanley Gervais, the following colloquy occurred:

"Q. Did there come a time when the husband of the defendant, Virgilia Miranda Calvente, appeared at the police department?

"A. Yes, he did.

"Q. And what, if anything did he say?"

At that point, defense counsel objected and the jury was excused. Defense counsel argued that the statements that the state was seeking to admit were hearsay. The state argued that the statements were not being offered for their truth but to show that they were said and to show the existence of a conspiracy. The court overruled the objection, and the jury returned to the courtroom. Upon further examination of Gervais, the following colloquy occurred:

"Q. Did there come a time that evening, Detective, when the husband of the defendant . . . appeared at your police department?

"A. Yes, there was.

"Q. Did he offer a purported explanation of where the $2500 which you seized from his wife's purse came from?

"A. Yes.

"Q. What did he say?

"A. He said he had earned it as overtime money.

"Q. Did he know how much money was in the purse?

"A. No, he did not. He said he knew—he had saved it over a couple of months and he didn't know how much it was, but it was a large amount.

"Q. Did anyone at the police department tell him that the state buy money was in that roll of bills?

"A. No, we did not.

"Q. Did he come back the following day to the police department?

"A. Yes.

"Q. And did he again proffer an explanation as to where the money came from?

"A. Yes.

"Q. And when he came back the following day, did he then know how much was in the purse?

"A. He knew exactly how much was in the purse.

"Q. And did there come a time when he asked to give you a written statement?

"A. Yes.

"Q. And did you take one?

"A. Yes, I did."

At that point, defense counsel objected to the admission of the written statement on the grounds of hearsay. The court admitted the statement as a full exhibit.

"It is well settled that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . [Its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make *every reasonable presumption* in favor of upholding the trial court's ruling, and only upset

it for a *manifest abuse of discretion.* . . . Moreover, evidentiary rulings will be overturned on appeal only where there was . . . a showing by the defendant of substantial prejudice or injustice. . . . [T]he defendant . . . must show that it is more probable than not that the erroneous action of the court affected the result." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Van Nest* v. *Kegg,* 70 Conn. App. 191, 201, 800 A.2d 509 (2002).

"In Connecticut, an out-of-court statement offered to prove the truth of the matter asserted is hearsay. . . . If such a statement is offered for a purpose other than establishing the truth of the matters contained in the statement, it is not hearsay." (Citation omitted.) *State* v. *Esposito,* 223 Conn. 299, 315, 613 A.2d 242 (1992).

In this case, the state did not offer the statements to show that the money did not belong to the defendant's husband or that the amount of the money was $2500. Rather, the state offered the statements to illustrate a conspiracy among the defendants because the defendant's husband would have had to speak to one of the defendants to know the amount of money found in the purse.

Furthermore, even if we were to conclude that the statements were admitted improperly, we still would not conclude that the defendant has shown substantial prejudice or injustice or that the result of the trial was affected. First, the court gave a limiting instruction to the jury that the statements were not offered for their truth. It is well settled that "[u]nless there is a clear indication to the contrary, a jury is presumed to follow the court's instructions." (Internal quotation marks omitted.) *State* v. *Coughlin,* supra, 61 Conn. App. 96. Second, "if erroneously admitted evidence is merely cumulative of other evidence presented in the case, its admission does not constitute reversible error." (Inter-

nal quotation marks omitted.) *State* v. *Senquiz*, 68 Conn. App. 571, 583, 793 A.2d 1095, cert. denied, 260 Conn. 923, 797 A.2d 519 (2002).

In this case, the state presented other evidence to support the inference that there was a conspiracy between the defendants to sell drugs. The police made a controlled buy of marijuana at the apartment, and, when they entered the apartment, all of the defendants were present. They observed large amounts of marijuana and plastic bags in the open, supporting an inference that the marijuana was being prepared for sale. The police recovered a large amount of money from the defendant, including the money used in the controlled buy earlier that day. In addition there was also evidence that the defendants were depositing large amounts of money in bank accounts. We conclude, therefore, that even if the statements were admitted improperly, such error, in the context of the entire evidence, was harmless. Accordingly, we conclude that the court did not abuse its discretion in admitting the oral and written statements of the defendant's husband.

The judgment in each case is reversed only as to the conviction of risk of injury to a child and conspiracy to sell a controlled substance within 1500 feet of a public housing project, and the cases are remanded with direction to render judgments of not guilty of risk of injury to a child and for new trials on the charges of conspiracy to sell a controlled substance within 1500 feet of a public housing project. The judgments are affirmed in all other respects.

In this opinion the other judges concurred.